[Civ. No. 13991.   Second Dist., Div. Three.   Nov. 5, 1943.]

WATSON LAND COMPANY (a Corporation), Appellant, v. RIO GRANDE OIL COMPANY (a Corporation), et al., Respondents.

[Civ. No. 13992.   Second Dist., Div. Three.   Nov. 5, 1943.]

WATSON LAND COMPANY (a Corporation), Appellant, v. JESSIE B. HARSHMAN et al., Respondents.

O'Melveny & Myers, Pierce Works and L. M. Wright for Appellant.

Henry E. Carter for Respondent Ranger Petroleum Corporation.

BISHOP, J. pro tem.—The plaintiff has appealed, in each action, from that part of the judgment which recognized that the defendants had rights under an oil lease on the west thirty of some fifty-seven acres to which plaintiff's title was otherwise quieted. It is plain, from the evidence and findings, that, except for very limited purposes, the rights of the defendants under the oil lease had terminated because there had not been a continued drilling of new wells on the demised

property after the completion of the first well, unless the failure to drill the additional wells was excused, and the forfeiture of the lease escaped, by virtue of this provision of the lease: "Drilling and pumping operations shall be suspended . . . so long as oil of the quality produced on said property shall be less than seventy-five cents (75¢) a barrel at the well." The conclusion we have reached is that the evidence is insufficient to support the conclusion that the obligation to continue to drill new wells had been suspended.

The plaintiff and the defendant Ranger Petroleum Corporation ( the only defendant to file a brief on appeal) disagreed at the trial and disagree now as to the meaning of the provision of the lease which we quoted. Plaintiff's position is that the proper meaning to be given the provision is that in which it is and has been used and understood by the oil industry in the Los Angeles Basin area. As established by the testimony of witness Wents the provision bears this meaning in the oil industry: drilling operations shall be suspended so long as oil of the quality produced on said property shall be quoted at a price less than 75¢ a barrel in the list of prices posted by the Standard Oil Company of California for the Wilmington field, the field in which plaintiff's property is situated. The prices posted vary for different qualities of oil, the quality being measured by the gravity of the oil computed on the basis that it contains less than three per cent of water and bottom sediment. In other words, the lessee need not proceed to drill further wells so long as oil of the quality produced on the leased property is posted at less than 75¢ a barrel, it being understood that the posted price refers to oil with not to exceed three per cent water and bottom sediment, so that if the oil as produced contains a greater percentage than three per cent, the excess is eliminated in computing the quantity to be paid for at the posted price.

The attack upon this evidence was not and is not made upon the ground that the oil industry did not so understand and employ the terms of the quoted provision; there was no refutation of witness Wents' testimony. ■ At the trial the objection was voiced to the admission of the industry's interpretation of the provision "on the ground that the technical meaning will not vary the plain wording of the contract" and "We just cannot see the object of going into the custom or understanding of somebody else." On this appeal it is still argued that because "There is no ambiguity or uncertainty

in the suspension clause of the contract'' the testimony as to the usage of the industry should not be considered. Defendants do not contend, and there is no basis for the contention, that there is any provision of the lease which indicates an intent that the quoted provision shall not be understood as usage interprets it. This being so, the special meaning given to the words by usage must be followed (Civ. Code, sec. 1644) and evidence as to that usage is admissible (Code Civ. Proc., sec. 1870, subd. 12). This statement in *Hind* v. *Oriental Products Co., Inc.* (1925), 195 Cal. 655, 667 [235 P. 438], is followed by a list of authorities, including 6 Cal.Jur. 315 ''and cases cited'': ''It is the general rule that when there is a known usage of the trade, persons carrying on that trade are deemed to have contracted in reference to the usage unless the contrary appears; that the usage forms a part of the contract, and that evidence of usage is always admissible to supply a deficiency or as a means of interpretation where it does not alter or vary the terms of the contract.''

■ Further objection is made that ''[b]efore evidence of usage can be given any effect in the construction of a contract, it must appear that the parties thereto were aware of the existence of the custom.'' Their awareness may appear, however, from the fact that the parties are engaged in the trade or industry where the usage is common. It is so stated in the quotation appearing in the preceding paragraph, and also in *Corey* v. *Struve* (1911), 16 Cal.App. 310, 320 [116 P. 975], and *Latta* v. *Da Roza* (1929), 100 Cal.App. 606, 608 [280 P. 711, 281 P. 655]. The original lessee in the lease with which we are now concerned was the Rio Grande Oil Company. There was no evidence that this concern was unaware of the meaning given to the quoted provision of the lease by the oil industry and that it was engaged in that industry is a matter of common knowledge.

■ The defendant argues further that because the oil industry's usage was not pleaded by the plaintiff evidence concerning it was improperly received and may not be considered. Plaintiff's complaint was a simple one, suitable in an action to quiet title. By way of defense the Ranger Petroleum Corporation set up the lease, in legal effect, including the provision upon which it relies to protect it against forfeiture. If a plaintiff need ever plead a technical interpretation of a provision of an instrument in order to rely upon it, in the case before us that need did not arise until the defend-

ant filed its answer setting up the lease. But by that time the pleadings by which issues of fact may be joined had ended; the plaintiff, under our system of pleading, had no opportunity to file a replication to the new matter set up in the defendants' pleading, and so it could proceed to prove its interpretation of the provision without a prior pleading of it. (See *Buford* v. *Florin Fruit Growers' Assn.* (1930), 210 Cal. 84, 91 [291 P. 170]; *Hedlund* v. *Sutter Medical Service Co.* (1942), 51 Cal.App.2d 327, 332 [124 P.2d 878].)

██ From the recital of the pleadings it is furthermore apparent that the burden of proving its defense, that the obligation to continue to drill new wells had been suspended, was on the defendant Ranger Petroleum Company. (*Richter* v. *Adams* (1937), 19 Cal.App.2d 572, 576 and 579 [66 P.2d 226].) In its endeavor to prove that it was excused, by the low price of oil, from fulfilling the drilling obligations of the lease, the defendant was handicapped by its erroneous interpretation of the provision upon which it relied. In substance, the theory on which the defendant offered its evidence was that it was excused from drilling so long as it was unable to obtain 75¢ per barrel for the oil it produced. So, over timely objection, it was successful in introducing evidence that it had never been offered or received as much as seventy-five cents a barrel for its oil. In explanation of its inability to receive as much as seventy-five cents a barrel for its oil the defendant brought out that there was no pipeline connection between its well and any of the oil companies who were controlled by the posted price, which only applied to oil delivered into pipe lines, and at best a hauling deduction of 5¢ from the price posted for oil of the quality it produced would reduce that price, to it, to 70¢ per barrel. Furthermore, its president testified, it produced such a small quantity of oil, with such a high water content, that the larger companies were not interested in buying it; it had to be sold to the smaller refineries. If this evidence was material, then the provision of the lease on which our interest is centered would have the practical effect of giving the defendant an option to drill new wells or not as it finds it to its advantage. If it desired not to drill more than the first well, all that it need do would be to fail to make it possible, or easy, for any oil refinery to gain access to such quantities of oil as it produced, with the result that the best price it could receive would necessarily be low. But this whole theory is based on the false premise

that defendant's duty to drill is dependent on its ability to get a certain price for the oil which it produces. Instead, as we have seen, the test is whether there is a posted price of at least seventy-five cents for oil of the quality produced by the defendant, not for that oil itself.

In view of the erroneous theory which the defendant urged throughout the trial, and upon which it was permitted to introduce evidence, we are hesitant to construe the court's finding with respect to the question as a finding on the actual issue involved. The finding, omitting an immaterial reference at the end, is this: ''That the price of oil produced on said demised premises since the completion of said well has been less than 75 cents per barrel for oil of the quality produced on said demised premises. . . .''

But if we read this finding as though it did not refer to the price received for the oil produced on the premises, but instead determined that the price of oil of the quality produced on the premises was less than 75¢ per barrel, then we find it unsupported by any substantial evidence. The prices posted for oil in the Wilmington field began with oil of a gravity of 14-14.9; the price was 75¢ per barrel. Plaintiff produced witnesses who testified that samples which they took from the ditch leading to defendant's sump run better than 14 gravity. If we accept defendant's criticism of this evidence and conclude that the trial judge may have disregarded it, that will not help the defendants discharge the burden of proof which was theirs. They produced one witness who had made a test of their oil and found it to be 13.6 gravity, but on cross-examination this proved to be wet gravity, and so not the gravity referred to in the posted prices. The dry gravity, the witness admitted, ''could have been'' higher. How much higher, was left to speculation. The testimony of defendant's president, that the oil his company was producing had a gravity of less than 14, has no probative value in view of the facts that, as revealed by his subsequent answers, he did not speak of his own knowledge, but based his statement on the ''run tickets'' of the refineries which bought the product of his wells, and there was no showing of the basis on which the run tickets were computed. We note, furthermore, that there was evidence that as a matter of fact the three major oil companies, those who posted prices, were paying the same price, seventy-five cents per barrel, for oil of 13.6-14.00 gravity as they were for

oil running between 14 and 14.9, and no evidence to the contrary.

■ The usual rule that forfeitures are not favored does not apply to a case such as this, where the productive possibilities of plaintiff's property are blocked for a long term by defendant's lack of ability, or desire, to develop them. (*Slater v. Boyd* (1932), 120 Cal.App. 457, 460 [8 P.2d 182].)

The portions of the judgments from which plaintiff appealed are reversed.

Desmond, P. J., and Shinn, J., concurred.