[Civ. No. 19760.   Second Dist., Div. One.   Mar. 1, 1954.]

BROGDEX COMPANY (a Corporation), Respondent, v.
RUSSELL M. WALCOTT et al., Appellants.

576

Loeb & Loeb, Nichols, Cooper, Hickson & Lamb, Herman F. Selvin and Harry L. Gershon for Appellants.

Faries & McDowell and Ralph B. Hubbard for Respondent.

DRAPEAU, J.—By the instant action, plaintiff sought injunctive and declaratory relief and also an accounting.

The complaint alleges that by a written agreement dated August 9, 1948, plaintiff licensed defendants to distribute a wax process for the treatment of fruits and vegetables in preparation for market. The patent for this process was owned by plaintiff. The license rights granted by the agreement were personal to and nonassignable by defendants and they were both required to ''devote their full time and best efforts as said licensing representatives of plaintiff and not to engage in any business which would in any way compete with said licensed processes . . .''

Also, that on May 9, 1950, defendants began working for S. C. Johnson & Son, Inc., as its exclusive representatives in Arizona and California, selling and licensing products and processes which were in direct competition to the patented processes of the plaintiff.

On May 11, 1950, plaintiff gave notice to defendants that, because they were not devoting their full time and effort as required under the contract of August 9, 1948, and were engaged in work antagonistic to the performance thereof and in competition to the processes of plaintiff, they had violated the contract; hence, it was terminated as of May 11, 1950, in accordance with its terms.

The existence of an actual controversy between the parties was alleged in that plaintiff asserted and defendants denied that ''by the terms of the contract and by reason of the fiduciary relationship of principal and agent between plaintiff and said defendants . . . plaintiff had the legal right to terminate said license agreement on May 11, 1950 . . .''

Among other things, the trial court found as follows:

Plaintiff and defendants, Walcott and Cunning, as individuals and copartners, entered into the agreement of

August 9, 1948, granting to defendants an exclusive license to use and sublicense in California and Arizona, a patented process owned by plaintiff and known as the powdered wax process or "Snowax."

The process is one whereby wax is applied to various kinds of fresh fruits and vegetables, in preparation for market for the purpose of reducing shrinkage and decay, and to make them more attractive for marketing. Defendants did not use the process themselves, but sublicensed it to sublicensees in California and Arizona, who paid royalties to them, and they in turn paid royalties to plaintiff.

The rights granted to defendants by the contract were "personal to them and nonassignable by them." They were required to devote their best efforts in the performance of the agreement. This they failed to do after May 1, 1950.

Upon termination, all license rights were to cease immediately and any attempted assignment would result in automatic termination.

The services of defendants contracted for "were unique, specialized, personal, joint and several, and said services, as such, of said defendants were essential to the performance of the agreement."

Early in January of 1950, defendants began negotiating with Johnson Wax Company of Racine, Wisconsin, for the exclusive right to sell and distribute the Johnson process in California and Arizona. This process had not been successfully marketed in California; was identical to Snowax and in direct competition to it.

In March of 1950, when defendants asked permission of plaintiff to sell and distribute the Johnson process, plaintiff denied such permission.

Prior to May 9, 1950, Walcott, Cunning and Johnson agreed that if Johnson would waive its age-limit requirement, Cunning would become a full-time employee of Johnson and would organize a company to be called "Packers Wax Service," separate and apart from R. M. Walcott Company, to distribute the Johnson process. The R. M. Walcott Company would manufacture the "foamer" for use in the Johnson process for any customer who ordered the same. This agreement was not conditioned upon the consent of plaintiff, nor was such approval or consent ever obtained from plaintiff by defendants.

"Prior to May 9, 1950, and after April 20, 1950, defendant

Cunning became a full time, salaried employee of Johnson as its representative on the West Coast, including California and Arizona, to promote, sell and distribute for Johnson the Johnson process and . . . waxes.''

''On May 9, 1950, defendant Walcott informed plaintiff that defendant Cunning had become a full time employee of Johnson as of May 1, 1950.''

''On May 11, 1950, plaintiff gave defendants written notice of the termination of the agreement, which they received on May 12, 1950.

''On May 13, 1950, defendant Cunning solicited orders for the Johnson process. On May 15, 1950, R. M. Walcott Company commenced the manufacture of two of the Johnson 'foamers.' ''

Further findings pertain to (1) the sum of $17,000 received as royalties from sublicensees after termination of the agreement, which was placed in trust accounts under agreement of the parties; (2) stipulation that plaintiff have judgment for $1,500 as an accounting under its second cause of action; and (3) termination of two minor agreements made in connection with the license agreement.

Thereafter judgment for plaintiff was entered to the effect that the written agreement of August 9, 1948, was lawfully and justifiably terminated by plaintiff on May 11, 1950. Defendants, as individuals and copartners, were permanently enjoined from licensing, sublicensing or practicing the wax process of plaintiff, or collecting any royalty or license fee therefor which became due after May 11, 1950; and from holding themselves out as agents of plaintiff under the agreement of August 9, 1948. Plaintiff to recover the sums of $17,234.14 and $1,533.27 and costs. Defendants and cross-complainants to take nothing by their fifth amended cross-complaint on file herein.

From this judgment defendants appeal.

Appellants state there are two basic issues determinative of this appeal, to wit:

''(1) Was Cunning actually employed by S. C. Johnson & Son prior to the termination by Brogdex of the agreement of August 9, 1948?

''(2) If he was, did he thus violate any term or condition of that agreement?''

In connection with their first point, appellants assert that the evidence does not support finding numbered XII that Cunning had actually become a Johnson employee prior to

May 9, 1950, and therefore the purported termination of the agreement of August 9, 1948, was legally premature and without legal cause.

Appellants attack but one finding. By failure to question the sufficiency of the evidence to sustain the other findings, they have conceded that there is substantial evidence to support them. (*Rosenberg* v. *Raskin,* 80 Cal.App.2d 335, 338 [181 P.2d 897].)

The evidence presented on the point at issue is briefly as follows:

Mr. W. J. Wallace, Jr., president of Brogdex, testified that he was present at a meeting held early in March with Messrs. Walcott, Cunning, Nichols (their attorney), LeBeau, general manager of Brogdex, and Baker Wallace, its vice president, when Mr. Walcott "asked for permission of Brogdex to acquiesce in his taking on the Johnson license of agricultural waxes for the states of California and Arizona." This consent was withheld by respondent. The same parties met again within a few days when respondent's decision was reaffirmed, because to take on the Johnson license "would be a violation of the contract."

The next discussion took place on May 9, 1950, when Mr. Walcott telephoned the office of Brogdex in Pomona and asked for an audience. At this meeting the witness, W. J. Wallace, Jr., Baker Wallace, Mr. LeBeau and Mr. Walcott were present.

"Mr. Walcott said that he would like to give us some information first hand rather than to hear it by rumor, and that was to the effect that Mr. Cunning had gone to the Johnson Wax Company, that their partnership had been dissolved and that Mr. Cunning had been on the payroll of Johnson Wax since May 1, 1950.

"Q. What else did Mr. Walcott say, if anything? A. He said that more than ever before we should work closer together, in view of the fact that we had another competitor in the field, and to do everything we could to meet that new competition."

The officers of Brogdex did nothing at that time. Very shortly thereafter they discussed the situation with their attorney and on May 11, 1950, mailed to Mr. Walcott the notice terminating the agreement of August 9, 1948. And on May 16, 1950, respondent notified each of the 25 or more sublicensees "that we had terminated the license agreement."

On cross-examination, this witness testified that at the May meeting, Mr. Walcott came in and told him that Mr. Cunning

had gone on the Johnson payroll on May 1, 1950; that Cunning had severed his connection with the Walcott Company and was on the Johnson payroll.

This evidence was corroborated by Messrs. F. Baker Wallace and LeBeau, officers of respondent company.

Mr. Cunning was examined by respondent under section 2055, Code of Civil Procedure. He testified that he was employed by Johnson "about May 15," but did not do any soliciting for about a week; that he went on the Johnson payroll May 15th, but was paid from the first. "It was retroactive to the first." He also stated that the thought that he was to go to work for Johnson "was expressed back as far as the first of May."

Mr. Carse of the Johnson Company testified that the company "customarily made any employment retroactive to the first of the month irrespective of when a person comes to work for us for the record."

■ This court is of the opinion that the above evidence and the inferences deducible from it, substantially support the finding that Mr. Cunning became a full-time salaried employee of Johnson prior to May 9, 1950.

In connection with their second point, appellants urge that "the license agreement neither expressly nor by necessary implication requires the rendition of personal services by both Walcott and Cunning. It was therefore not violated by any alleged prospective failure of Cunning to render such services."

The agreement was made with appellants "as individuals and as copartners," and provided that "the license rights herein granted Licensee are personal and non-assignable by Licensee except with the written consent of Licensor and any attempted assignment of same otherwise, in whole or in part, shall automatically terminate this agreement in its entirety . . ."

The agreement permitted an assignment without consent of licensor, in the event that the "Licensees and each of them" shall form a corporation and assign thereto the assets and goodwill of the Walcott Company. It further provided: "If at any time after such assignment to such corporation the said Russell M. Walcott and T. George Cunning fail to have voting control of said corporation . . . or one or the other of them for any reason, does not devote his full time and best efforts to the business of said corporation, Licensor may, at its option, forthwith terminate this agreement."

As heretofore recited, the trial court found that "the services of defendants for which Brogdex contracted, pursuant to the agreement, were unique, specialized, personal, joint and several, and said services, as such, of said defendants were essential in the performance of the agreement." This finding was not attacked by appellants as being unsupported by the evidence, and is therefore binding on appeal. (*Rosenberg* v. *Raskin, supra* (80 Cal.App.2d 335, 338, 339).)

And, as stated by this court in *Brawley* v. *Crosby etc. Foundation, Inc.*, 73 Cal.App.2d 103, 112 [166 P.2d 392]: "In this, as in every contract, there is the implied covenant of good faith and fair dealing: that neither party will do anything that would result in injuring or destroying the right of the other to enjoy the fruits of the agreement. (Citation of authorities.) The law will therefore imply that under its agreement appellant was obligated in good faith and by its reasonable and best efforts to develop, exploit, produce and make sales of the rotary pump in question." See also *Matzen* v. *Horwitz*, 102 Cal.App.2d 884, 892 [228 P.2d 841].

The rights granted to appellants under the agreement in question were "personal to them and non-assignable by them." Appellants were obligated to devote their best efforts in performing their part of the contract. In the circumstances presented, the law will imply that the personal services of both appellants were required. Therefore, when appellant Cunning became an employee of Johnson in work antagonistic to and in competition with that of respondent, he breached the implied obligation of the agreement to deal fairly and in good faith with respondent, thereby justifying its termination.

The construction given the agreement by the trial court "appears to be consistent with the true intent of the parties, and where that is so, the appellate court will not substitute another interpretation though it seems equally tenable." *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 772 [128 P.2d 665].

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 23, 1954, and appellants' petition for a hearing by the Supreme Court was denied April 28, 1954.