[Civ. No. 16455. First Dist., Div. One. Aug. 15, 1955.]

ASSOCIATED LATHING AND PLASTERING COMPANY (a Corporation), Appellant, v. LOUIS C. DUNN, INC. (a Corporation), Respondent.

John V. Lewis and John G. Evans for Appellant.

Landels & Weigel and Stanley A. Weigel for Respondent.

PETERS, P. J.—Plaintiff, Associated Lathing and Plastering Company, brought this action against defendant, Louis C. Dunn, Inc., for breach of contract. Defendant denied that it had breached the contract, and by cross-complaint charged plaintiff with a breach, and sought damages for it. The trial court found that plaintiff in fact had breached the contract, and awarded defendant on its cross-complaint the sum of $1,678. Plaintiff and cross-defendant appeals.

Respondent, who was the general and the cement contractor for the construction of a hospital, solicited bids for the lathing and plastering work. Appellant, about the middle of April, 1952, was notified that it was the successful bidder. On May 1, 1952, respondent prepared the subcontract, and Mr. DeAngelis, president of appellant was notified to come to respondent's office to sign it. Mr. DeAngelis failed to do so. On May 22, 1952, respondent mailed the contract to appellant. The appellant made certain modifications, and the contract as modified was finally signed by both parties late in June of 1952.

Not only in securing appellant's signature on the contract, but in other ways respondent had difficulty in securing appellant's cooperation. On May 8, 1952, respondent, by

letter, requested from appellant certain priority materials information required by the federal government, requesting an immediate reply so that appellant could be issued a job priority rating. Receiving no reply over a period of time, an officer of respondent telephoned to appellant at least six times unsuccessfully seeking the information. The requested information was not received until October 22, 1952, in a letter dated October 20, 1952, but postmarked 7:30 p. m., October 21st. These dates are important, because, as will later appear, respondent terminated the contract during the day of October 21, 1952.

On September 10, 1952, respondent by letter requested appellant to send it, not later than September 15th, certain price information on the cost of some changes contemplated by the architects. This information was not furnished to respondent prior to the date respondent terminated the contract, October 21, 1952.

The dispute that finally led to the termination of the contract was over the installation of certain wire hangers from which the suspended ceilings were to be hung. On October 14, 1952, respondent notified appellant to install these hangers so as not to delay the pouring of the concrete, scheduled for October 21, 1952. On October 17, 1952, appellant, by letter, took the position that, under the contract, these hangers were to be installed by the cement contractor. On October 20th an officer of respondent phoned DeAngelis, and the two had an argument over whose duty it was to install the hangers. DeAngelis promised to give a definite answer the next day. He did not do so, and, on October 21, 1952, the officer of respondent phoned DeAngelis and requested an answer. DeAngelis stated that appellant would not install the hangers because that was the duty of the concrete contractor. DeAngelis then talked to the president of respondent who asked DeAngelis if he was going to install the hangers. When DeAngelis stated that appellant would not do so, the president of respondent stated: "All right, if that is your attitude, or if that is the way it is, your contract is hereby cancelled."

The refusal of DeAngelis was apparently not absolute. He testified that he told the officers of respondent that even though it was not his job he was willing to install the hangers if the parties could discuss later whether appellant would be entitled to extra compensation for the work. With some qualifications, this conversation is admitted by respondent.

On the same date as the oral termination, October 21, 1952, respondent sent appellant a registered letter, stating, in part:

". . . Since the start of the job we have had no cooperation from your office. We have tried in vain to obtain the following information.

"1. Priority data.

"2. Prices on change orders as listed in letter of September 10, 1952.

"Recently we informed you to start your work on the hanging wires, but have been informed that you do not intend to do the work. We are, therefore, giving you notice that your contract has been broken and is now void. We are making arrangements to have this work performed by others."

Two days later, on October 23, 1952, appellant wrote to respondent, in part, as follows:

"Realizing that an authoritative ruling on this disputed question cannot be had immediately, we propose that you furnish us with a letter permitting us to do this work without prejudice to our rights to recover, in addition to the contract price, the reasonable value of the labor and materials required to take care of the disputed work.

"By so doing, you, of course, would not waive the right to make the same contention that you now make and we would not waive our rights under the contract . . .

"If you will . . . agree . . . we will proceed forthwith with the disputed work."

On October 22, 1952, respondent had entered into a contract with the lathing contractor who had submitted the second lowest bid, which contract provided for a price $1,678 higher than appellant's contract. Accordingly, on October 25, 1952, respondent's attorneys answered appellant's letter of October 23, 1952, by stating that, because appellant had repeatedly breached its contract, it had caused respondent to incur substantial damages because of the delay, and had caused additional expense in that respondent, to avoid further damage, had been compelled to make other arrangements at increased cost for the lathing and plastering work. The letter notified appellant that respondent intended to hold appellant strictly accountable for these damages.

DeAngelis testified that the cost of installing the hangers would be about $3,500. The total lathing subcontract was for nearly $140,000.

Appellant thereupon brought this action for breach of

contract and respondent cross-complained for its damages caused by the alleged breach by appellant. The trial court, in substance, found that under the contract the obligation of installing the hangers was that of appellant; that appellant had failed to install the hangers, and had repudiated its contract; that appellant had repeatedly neglected, failed and refused to comply with its duty as a subcontractor to cooperate with the general contractor, a duty found to exist by custom and usage in this area; that respondent as a result of these breaches by appellant was compelled to enter into a contract with another plasterer at a higher price to respondent's damage in the sum of $1,678.

The first question presented is whether the subcontract imposed on appellant the obligation to install the challenged hangers. The trial court permitted parol testimony on this issue and based thereon, and on the terms of the contract, ruled that the obligation was that of appellant. It is urged by appellant that the contract in clear and unambiguous terms imposes the duty to install the hangers on the cement contractor (that is, the respondent, who was also the general contractor) and, therefore, parol evidence was not admissible.

The subcontract contained the following provision relating to the appellant: "First: The Sub-contractor agrees to furnish all materials and perform all work necessary to complete the furnishing and installation of the lathing and plastering work for the construction of the seven-story Kaiser Permanente Hospital, Geary Blvd. and Lyon St., San Francisco, in accordance with plans and specifications #5161 (more specifically Div. X, pp. 46-50, incl.) and addenda 1-6, inclusive, all prepared by Wolff & Phillips, 509 Pearson Bldg., Portland, Oregon."

Appellant contends that the following provision of the specifications relating to the obligations of the cement contractor imposed the duty to install the hangers on the cement contractor. "Insets, Anchors, Ties, Hangers, Etc. Building into concrete all inserts, anchors, ties, rails, hangers, bolts, nailing blocks, etc., required to secure work of other trades."

These specifications provided also that appellant, as the lathing and plastering subcontractor, should furnish "Runner channels shall be supported 4'-0"-o.c. with #8 galvanized wire or 1" x 3/16" flat bars." This is the material of which the hangers were to be made. Another provision of the specifications required appellant to "Check all ground, nail-

ing blocks, anchors, etc., installed by other contractors and do not plaster until all is straight and true . . .''

The trial court, over appellant's objections, permitted expert testimony to the effect that the phrase ''building into concrete'' as used in reference to the obligations of the cement contractor, according to custom and usage in the building trades in San Francisco, meant that the cement contractor should pour the concrete to encase fixtures previously installed by other contractors. This was the meaning given to the phrase by the trial court. There was also testimony and an admission that the installation of hangers for suspended ceilings is within the jurisdiction of the lathers' and plasterers' union, and that respondent, as the cement contractor, hired no men authorized to install such hangers.

Appellant also contends that the provision of the specifications requiring it to ''check'' certain things ''installed by other contractors'' clearly indicates that it was not required to install the hangers. Over objection, evidence was admitted, and believed by the trial court, that this clause did not relieve the appellant of the duty to install the hangers because ''ground, nailing blocks, anchors, etc.'' did not apply to the hangers.

Appellant relies on the so-called ''plain meaning'' rule, that is, that parol is not admissible when the contract is clear or unambiguous, and cannot be used to itself create the ambiguity. There are many cases discussing this subject. For this rule to be applicable it must be held, as a matter of law, that the phrase ''building into concrete'' is so clear that reasonable minds cannot differ as to its interpretation, and that it means only one thing, that is, that the cement contractor must install hangers in the forms so that they can be encased in concrete. But it is quite apparent that, even to a layman, the phrase can also reasonably mean that the cement contractor is simply required to encase the hangers installed by others when he pours the concrete. Since the phrase is capable of two meanings, parol evidence is admissible to explain it. ■ As this court stated in *Bartel* v. *Associated Dental Supply Co.*, 114 Cal.App.2d 750, 752 [251 P.2d 16] : ''Unless a court can 'to a certainty and with sureness by a mere reading of the document, determine which is the correct interpretation . . . extrinsic evidence becomes admissible as an aid to interpretation. . . .' (*MacIntyre* v. *Angel*, 109 Cal.App.2d 425, 429 [240 P.2d 1047].)''

The same rule was expressed in *Barham* v. *Barham*, 33

Cal.2d 416, at page 422 [202 P.2d 289], in the following language: "When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said.'" (See also *Schmidt* v. *Macco Const. Co.*, 119 Cal.App.2d 717 [260 P.2d 230]; *Sweeney* v. *Earle C. Anthony, Inc.*, 128 Cal.App.2d 232 [275 P.2d 56]; *Norton* v. *Farmers Auto. Inter-Ins. Exch.*, 40 Cal.App.2d 556 [105 P.2d 136]; *Ferris* v. *Emmons*, 214 Cal. 501 [6 P.2d 950]; *Jegen* v. *Berger*, 77 Cal.App.2d 1 [174 P.2d 489]; *Walsh* v. *Walsh*, 18 Cal.2d 439 [116 P.2d 62]; *Coughlin* v. *Blair*, 41 Cal.2d 587 [262 P.2d 305]; *Barnhart Aircraft, Inc.* v. *Preston*, 212 Cal. 19 [297 P. 20].)

But even if to a layman the phrase were clear and unambiguous, we are here dealing with a contract relating to the building industry, a specialized business, and it appears that the phrase in question has acquired a specialized and definite meaning to those in that business. This being so, the parol evidence was admissible to explain that specialized meaning. This rule was clearly stated by the Supreme Court in *Ermolieff* v. *R.K.O. Radio Pictures, Inc.*, 19 Cal.2d 543 [122 P.2d 3]. In that case the court held that, although the phrase "United Kingdom" was clear and unambiguous to a layman, parol evidence was admissible to show that by custom and usage in the movie industry the phrase was used to include "Eire," although that country is, of course, independent of the "United Kingdom." At page 550 the court stated: "The correct rule with reference to the admissibility of evidence as to trade usage under the circumstances here presented is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense.

[Citations.] The basis of this rule is that to accomplish a purpose of paramount importance in interpretation of documents, namely, to ascertain the true intent of the parties, it may well be said that the usage evidence does not alter the contract of the parties, but on the contrary gives the effect to the words there used as intended by the parties. The usage becomes a part of the contract in aid of its correct interpretation.''

The basis for this rule is to be found in section 1645 of the Civil Code which provides: ''Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.''

This rule has been applied in many cases. (See *Watson Land Co.* v. *Rio Grande Oil Co.*, 61 Cal.App.2d 269 [142 P.2d 950]; *Ross* v. *Frank W. Dunne Co.*, 119 Cal.App.2d 690 [260 P.2d 104]; *Body Steffner Co.* v. *Flotill Products, Inc.*, 63 Cal.App.2d 555 [147 P.2d 84]; *Alta Planing Mill Co.* v. *Garland*, 167 Cal. 179 [138 P. 738]; *Myers* v. *Tibbals*, 72 Cal. 278 [13 P. 695]; *Coughlin* v. *Blair*, 41 Cal.2d 587 [262 P.2d 305].)

Once it appears that the parol evidence is admissible the appellate court is bound by the finding of the trial court adopting one of two or more reasonable interpretations. (*Pendell* v. *Westland Life Ins. Co.*, 95 Cal.App.2d 766 [214 P.2d 392]; *Schmidt* v. *Macco Const. Co.*, 119 Cal.App.2d 717 [260 P.2d 230].)

Appellant contends that the trial court should have interpreted the contract against the respondent, because respondent prepared the contract. That rule only applies ''in cases of uncertainty not removed by the preceding rules.'' (Civ. Code, § 1654.) Moreover, the real problem involves the specifications incorporated into the subcontract, and these were drafted by the architects, not respondent. It should also be mentioned that, as far as the subcontract is concerned, appellant drafted several of its important provisions, so that appellant as well as respondent joined in the draftmanship.

Appellant contends that a defense based on custom and usage must be pleaded, and, because it was not pleaded here, the evidence was not admissible. Two cases have directly held that evidence of usage is admissible whether or not it has been pleaded, on the theory that it must be presumed that the parties, being specialists in the field, knew of the trade usage or custom. (*Todd* v. *Meserve*, 93 Cal.App. 370,

381 [269 P. 710] ; *Covely* v. *C.A.B. Const. Co.,* 110 Cal.App.2d 30, 33 [242 P.2d 87] ; see also dicta in *Watson Land Co.·* v. *Rio Grande Oil Co.,* 61 Cal.App.2d 269, 272 [142 P.2d 950].)

Appellant next contends that the sole evidence of a repudiation by appellant related to the hangers; that this was a debatable issue; that it was not a sufficient cause for termination of the contract, and that there was no evidence of any other breach by appellants. This contention is not in accord with the facts. The letter from respondent to appellant notifying appellant of the termination specifically set forth the failure of appellant to furnish the priority data, and prices on the changes suggested by the architects as grounds for the rescission, as well as the failure to install the hangers. The priority information was not furnished until after the rescission, and the price information requested was never furnished.

Appellant offers various excuses for its failure to supply the requested information, and contends its failure to comply caused no actual damage to respondent. Such argument misses the point. Respondent, as general contractor, was required to coordinate the work of all the subcontractors. He was entitled to the cooperation of all subcontractors. Instead, in violation of this responsibility, appellant harassed and embarrassed respondent by failing to give the requested information. If a shortage of materials had developed, which was possible, such failure would have had most serious results. Respondent had the duty of guarding the construction from such a danger, and was entitled to the cooperation of all subcontractors in the performance of this duty. This was essential to the satisfactory completion of the contract. This cooperation it did not receive from appellant. This was a serious breach of duty. The fact that severe damages did not result from the breach bears only on the quantum of liability.

Appellant next contends that the three breaches committed by it—the failure to give price information, the failure to give priority information, and the failure to install the hangers—were not material breaches warranting respondent in cancelling a contract. The materiality of a breach is, of course, primarily a factual question. (*Smith* v. *Empire Sanitary Dist.,* 127 Cal.App.2d 63 [273 P.2d 37] ; *Gold Min. & Water Co.* v. *Swinerton,* 23 Cal.2d 19 [142 P.2d 22].) Moreover, the trial court was entitled to consider the

timing of the breaches in determining their materiality. A breach prior to or at the outset of performance may justify rescission when the same breach late in performance would not be significant. This thought is expressed in comment (a) to section 275 of the Restatement of Contracts in the following language: ''Where the failure is at the outset, a very slight failure is often sufficient to discharge the injured party . . . the question becomes one of degree. . . . Will it be more conformable to justice in a particular case to free the injured party, or, on the other hand, to require him to perform his promise, in both cases giving him a right of action if the failure to perform was wrongful.''

In the instant case the circumstances that the trial court was entitled to consider were these: The contract provided that time was of the essence. All of the subcontractors knew that respondent was the general contractor of an expensive and complex construction job, and was required to integrate and schedule the work of many subcontractors. Such an arrangement requires teamwork and cooperation. ▮▮▮ Up to the very day that the concrete was to be poured on October 21, 1952, there had been nothing but delay on the part of appellant. From all appearances, that delay was going to continue. The trial court was justified in believing that the facts showed that appellant was not going to cooperate. Cooperation was an implied term of the contract. (*Brogdex Co.* v. *Walcott*, 123 Cal.App.2d 575, 581 [267 P.2d 28].)

It may be that the findings that appellant expressly repudiated the contract are unsupported. The evidence shows that the refusal to install the hangers was a conditional refusal, conditioned upon appellant's right to recover the reasonable value of the work should it later be determined that appellant was not obligated to perform it. But it is not necessary to rely on a repudiation as a basis for the rescission. The trial court was justified in basing the rescission upon the fact of a material breach. As already pointed out, this was primarily a factual question. (*Medico-Dental Bldg. Co.* v. *Horton & Converse*, 21 Cal.2d 411 [132 P.2d 457].)

In determining the materiality of the breach the trial court was entitled to consider all the factors above mentioned. As was said in *Coughlin* v. *Blair*, 41 Cal.2d 587, 599 [262 P.2d 305]:

''. . . The circumstances of each case determine whether the injured party may treat a breach of contract as total. [Citations.] . . .

". . . there is a limit to the time a promisee must thereafter await performance. The trial court could reasonably conclude that that limit was reached here. . . . Although defendants had not expressly repudiated the contract, their conduct clearly justified plaintiffs' belief that performance was either unlikely or would be forthcoming only when it suited defendants' convenience. Plaintiffs were not required to endure that uncertainty or to await that convenience and were therefore justified in treating defendants' nonperformance as a total breach of the contract. [Citations.]"

The argument that the failure to install the hangers was a minor breach because the cost of installing them was only $3,500, while the total lathing contract was for $139,808, is not persuasive. The materiality of a breach does not depend upon the amount of money involved. In a complex construction contract a general contractor is not required to speculate as to whether a subcontractor is going to perform, where such subcontractor has already indicated that he intends to delay, hedge and refuse to cooperate. Under these circumstances, regardless of the findings of repudiation, there was substantial evidence to justify the trial court in finding a material breach warranting rescission.

Appellant challenges in several respects the award against it for $1,678. It is urged that because the person who was awarded the lathing and plastering contract had not finished the job at the time of trial, and had not yet been paid, respondent was not legally damaged. The assertion is untenable. Respondent was entitled to recover as damages the difference between the price for which appellant agreed to do the work, and the reasonable cost of completing the job. (*Richmond Wharf & Dock Co.* v. *Blake,* 39 Cal.App. 1 [177 P. 508]; *Growall* v. *Pacific Surety Co.,* 21 Cal.App. 185 [131 P. 73].) The contract price contained in the second contract was properly admitted as evidence of the reasonableness of the cost of this work. An expert testified that the second bid contained a reasonable price. This was sufficient.

 Equally untenable is the contention that the second bid called for more expensive materials than appellant's bid. This refers to the substitution of metal for rock lath. The evidence shows that the second contractor assumed this added cost. Both bids were based on the same specifications. Thus, the two contracts substantially corresponded. (*Milwaukee Bldg. Co.* v. *Wetzel,* 93 Cal.App. 775 [270 P. 382].)

 The last contention on this issue is that respondent failed to minimize damages by accepting the second highest bid, and by not soliciting new bids. Such contention ignores the very time element that justified respondent in canceling the contract. The solicitation of new bids would have unreasonably delayed the entire construction.

The other contentions of appellant are so unsubstantial as not to require comment.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 14, 1955, and appellant's petition for a hearing by the Supreme Court was denied October 13, 1955.