[Civ. No. 52771. Second Dist., Div. Five. Jan. 2, 1979.]

WEESHOFF CONSTRUCTION COMPANY,
Plaintiff and Respondent, v.
LOS ANGELES COUNTY FLOOD CONTROL DISTRICT,
Defendant and Appellant.

580

**COUNSEL**

John H. Larson, County Counsel, and Lawrence J. Booher, Jr., Deputy County Counsel, for Defendant and Appellant.

Monteleone & McCrory and William J. Ingalsbe for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.**—This appeal by the Los Angeles County Flood Control District arises out of a judgment granting damages to Weeshoff Construction Company in the amount of $31,781 for extra work performed during the execution of a construction contract.

The district now appeals the judgment, contending damages were improperly awarded. It claims: (a) there was no change in the original contract which required additional compensation for the plaintiff; (b) even if contractual change did occur, the district's failure to issue a written change order in accordance with the contract's "Change in Work" provision protected it from the court's finding that a change order had been issued; and even if a change had been ordered, plaintiff's failure to

comply with the "Extra Work" clause relieved the district of an obligation to pay plaintiff for costs incurred; and (c) even if a change order was issued and plaintiff was entitled to extra compensation, this compensation was improperly calculated by the court.

On or about May 9, 1972, the district advertised for bids for the construction and installation of a storm drain project in Pico Rivera. The district provided the project plans and specifications and administered the final contract. A portion of the project involved construction on Whittier Blvd., a state highway. The state required and the contract specified that during construction on Whittier Blvd. three traffic lanes were to be maintained during morning and evening commuting hours. The contract also included a state requirement prohibiting the use of temporary resurfacing on state highways.

While preparing a bid for this project, plaintiff's president Gerard Weeshoff concluded that the requirement to keep three traffic lanes open would not be feasible in some areas of Whittier Blvd. unless parts of the district's plans were altered. He considered submitting a letter concerning this problem with his bid, but was informed by a district engineer that he would be disqualified if he did so. He bid the job assuming that, after the contract was awarded, either the three-lane requirement would be reduced to cover only two lanes, or that the specifications would be changed such that by moving the project a few feet, three lanes could be adequately maintained. Mr. Weeshoff testified that his bid included costs for keeping three traffic lanes open, but only if specifications were altered as indicated. Because of the contract's prohibition against using temporary resurfacing on state highways, he did not include in his bid a cost for using temporary pavement on Whittier Blvd.

Plaintiff was low bidder on the project and was awarded the contract on or about June 20, 1972. Shortly after entering the contract, in July 1972, plaintiff proposed to the district that the construction line on Whittier Blvd. be moved four to five feet and that a ninety-six-inch pipe be substituted for the reinforced concrete box conduit. He believed these alterations would enable him to safely maintain three traffic lanes during commuting hours. On August 2, after several meetings during which plaintiff's request was denied, plaintiff resubmitted his proposal in a letter to the district. The district again refused his request, this time by a letter dated August 9, 1972.

In February 1973, plaintiff began construction of a sewer crossing on Whittier Blvd. Mr. Thomas Russi, senior construction specialist and senior site inspector for the project, testified that shortly after plaintiff began this sewer construction, plaintiff requested permission from the district to use temporary pavement at the intersection of Whittier and Rosemead in order to expedite construction. Having obtained the state's agreement, the district allowed the contractor to place temporary pavement on the condition that permanent reserves be moved in within five days. According to plaintiff, he did not request but was ordered by the district to use temporary pavement at this intersection. Plaintiff felt this was due to newly expressed state requirements for temporary resurfacing in this area. Plaintiff did introduce as evidence a January 17, 1973, entry from the diary of Mr. Russi which stated, "M. J. Clark gave me [a] letter [from the State Engineer's Office] authorizing the use of temporary pavement at certain areas on Whittier Boulevard, gave same to Mr. Miller." In a letter dated February 20, 1973, plaintiff requested that the district issue a written change order which would authorize compensation for the extra cost of laying the temporary pavement. No change order was issued and no extra payment was authorized.

In April 1973, plaintiff had begun work on a portion of Whittier Blvd. west of Rosemead Blvd. At this point, problems arose concerning the maintenance of three traffic lanes during commuting hours. Plaintiff had maintained these lanes by means of a hard sand compact, but this material did not satisfy the district. On April 19, 1973, plaintiff was given a written memo stating he had failed to maintain three traffic lanes and directing him to restore these lanes as required by contract. Plaintiff responded that he had restored the lanes in accordance with contract specifications, but the district declared the sand to be an inadequate material for safe traffic lane restoration. (Mr. Russi testified that during this period, the contractor had experienced a cave-in and the district felt that although sand was a sufficient material to support some traffic, it was not suitable for heavy traffic.) When plaintiff inquired of the district how he should restore the lanes, the district refused to give specific responses, but continued to order plaintiff to "fix" his lane restoration.

At about the same date, plaintiff received a letter from the district, dated April 20, which restated its position with regard to plaintiff's alleged failure to comply with contract terms because of inadequate traffic lane maintenance; it also stated: "If by April 22, 1973, you have not restored the street surface sufficiently to provide for the traffic

requirements, the District will commence such restoration operations, the cost of which shall be borne by you. In addition, should you continue operations causing noncompliance with the specifications or should you fail to immediately proceed with the work in a satisfactory manner and in compliance with the specifications, the District will request that the Board of Supervisors serve notice upon you and your surety demanding compliance as provided in the specifications, Subsection 6-4, 'Default by Contractor.' " On April 22, the district placed approximately 18 tons of temporary resurfacing material on Whittier Blvd., and on January 11, 1974, the district informed plaintiff that a sum of $758.65 was being deducted from his final payment to compensate the district for this act. Thereafter, plaintiff restored traffic lanes on Whittier Blvd. by means of temporary pavement. Plaintiff testifed that because of the strong position taken by the district, he felt temporary restoration was required in order to avoid forced termination of the project, withholding of payment, and a possible claim for breach of contract and damages.

On May 10, 1973, in a request similar to that submitted in July and August of 1972, plaintiff again submitted a written request to the district for authorization to alter the specifications for work on Whittier Blvd. so that he could properly maintain the required traffic lanes. On June 28, 1973, the district approved his request. In July 1973, after plaintiff had moved the center line of construction, there was continued discord between the parties over the use of temporary pavement. Plaintiff's superintendent, Mr. Veronesi, testified that he was ordered by the district's representative, Mr. Russi, to place temporary resurfacing material on intersections and commercial driveways. Mr. Weeshoff testified that temporary pavement was used for "all the catch basin connector pipes and on all the main line at street intersections and for maintaining driveways into markets and businesses. Very little was put along the longitudinal shoulder . . . for the traffic, very little if any." According to Mr. Russi, he never directed the placement of temporary pavement with an indication that such procedures would merit extra compensation. Also, Mr. Russi denied ordering the use of temporary pavement for business accesses or traffic intersections, but admitted ordering that these areas be kept open to traffic. At no time did the district issue any written change order regarding the use of or payment for temporary paving on Whittier Blvd.

On January 11, 1974, the district informed plaintiff of its intention to deduct $758.65 from plaintiff's final payment for the April 22, 1973,

resurfacing performed by the district. On February 13 and 14, plaintiff wrote to the district informing it that he would not assume responsibility for this charge; also, it requested a change order in the amount of $31,781 as compensation for extra work performed in applying temporary pavement on Whittier Blvd. for the period of July through November, 1973. The district refused to honor this request.

At trial, plaintiff claimed all costs related to the use of temporary pavement on Whittier Blvd. were incurred because of work extraneous to the original contract and, therefore, merited compensation. Evidence was produced in the form of invoices and employee hourly time records for costs borne in placing temporary pavement on Whittier Blvd. The invoices indicated delivery locations along Whittier Blvd.; the time records isolated hours spent in daily placement and removal of temporary resurfacing for the period in which construction occurred at this location. The work included resurfacing both on traffic lanes and on adjacent areas.

The superior court found that because temporary resurfacing had been prohibited by contract on state highways and because Whittier Blvd. was a state highway, the placement of temporary pavement in this area was work in excess of contractual definition. The court also found that plaintiff, from the beginning, had requested a change in specifications which would eliminate hazardous and unfeasible fulfillment of the three-lane requirement, but was originally denied his request; that on January 17, 1973, just prior to the commencement of work on Whittier Blvd., the Department of Highways changed its requirements to include the use of temporary pavement on Whittier Blvd.; that when plaintiff complied with the new requirement and requested additional compensation for "extra work," he was denied payment. The court found that plaintiff's use of hard packed sand did comply with contract terms and that by its actions of April 22, 1973, the district had, in effect, issued a change order. It also found that, by its conduct, the district waived the contract requirement for daily reports regarding extra work costs. Because the district failed to pay plaintiff for extra work performed, it breached its contract, thereby damaging plaintiff in the amount of $31,781. Plaintiff was granted judgment in that amount with interest at the rate of 7 percent per annum and costs of suit.

The district contends that its role in inducing plaintiff's use of temporary pavement on Whittier Blvd. did not effect a change in the

terms of the original contract or an extra work order; that although the original contract did prohibit the use of "temporary resurfacing" on state highways such as Whittier Blvd., the terms "temporary resurfacing" and "temporary pavement" are not synonymous, and the trial court's finding to that effect was erroneous. According to the district, the term "temporary resurfacing" prohibited on state highways by section B-15.2.1[1] was used to describe a lengthy procedure undertaken by road contractors prior to permanent restoration of road surfacing; this procedure was contractually prohibited on state highways. On the other hand, the plaintiff's use of "temporary pavement" as a short-term maintenance material to restore a third traffic lane during commuting hours had never been contractually prohibited on state highways, but was always an alternative material available to plaintiff for keeping the three traffic lanes open at required hours.

In his testimony, Mr. Weeshoff stated he had interpreted the contract's prohibition of "temporary resurfacing" on state highways to exclude any use of "temporary pavement" on Whittier Blvd., and that his accepted bid had reflected this understanding. Throughout the trial both terms (temporary resurfacing and temporary pavement) were used to refer to temporary material used for maintenance on Whittier Blvd. Even the district's witness, Mr. Russi, used the term "temporary resurfacing" in this regard. Also, it appears that state approval was required before the temporary material could be laid on the state highway, a factor which tends to support plaintiff's claim that this was the "temporary resurfacing" prohibited by contract. On balance, the district's claim that the contractual prohibition should be construed as not applicable to temporary pavement used in daily maintenance procedures is not convincing. No expert testimony was produced to support such a construction, nor, it seems, was the construed differentiation central to the testimony of any witness.

The most the district may be granted is that the meaning of the terms in question may have been ambiguous. ■ In case of uncertainty of meaning, the written contract must be construed against the drafter. (*Hellman* v. *Great American Ins. Co.,* 66 Cal.App.3d 298, 303 [136 Cal.Rptr. 24]; *Beaumont-Gribin-Von Dyl Management Co.* v. *California*

[1]Section B-15.2.1 states: "All existing street paving shall be removed and trimmed as specified in subsection 306-1.5 except within State Highways.

"Existing paving within State Highways shall be removed and trimmed in accordance with the provisions of section C-12 of the General Provisions and Standard Drawing 2-D 187."

*Union Ins. Co.,* 63 Cal.App.3d 617, 622 [134 Cal.Rptr. 25].) ▮ California Civil Code section 1654[2] has established that in contracts between a public body and a private party, uncertainty is presumed to have been caused by the private party. However, this presumption is rebutted when it is shown that the written contract was prepared by the City. *(Department of W. & P.* v. *Okonite-Callender C. Co.,* 181 F.2d 375, 380, fn. 3.) Since the city was responsible for the preparation of the contract at issue, any ambiguity must be construed against it in favor of Weeshoff Construction Company. ▮ We affirm the trial court's finding that these terms did, in fact, refer to the same process. ▮ Since the trial court also found the district had ordered temporary pavement to be used as a maintenance material, it properly found the district had ordered a procedure constituting a change in contractual terms by requiring a formerly prohibited process.

Next, the district contends that because it did not provide a written change order in accordance with the express requirements of the "Changes in Work, Changes Initiated by the Agency" provision, section 3-2,[3] the court erroneously found a change order to have issued. Section 3-2 requires that change orders be issued in writing and that they contain price or payment information; if price has not been negotiated, the contractor may proceed and be paid in accordance with the "Extra Work" clause, section 3-3,[4] which determines contractor's pay on the basis of his cost. The extra work clause stipulates that the contractor is to submit to the district daily written expenditure reports, which are to be reconciled and signed by the parties.

---

[2]Civil Code section 1654 reads as follows: "Words to be taken most strongly against whom. In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party; except in a contract between a public officer or body, as such, and a private party, in which it *is presumed* that all uncertainty was caused by the private party." (Italics added.)

[3]Section 3-2, in part, requires: "Change orders shall be in writing and state the dollar value of the change or establish method of payment, any adjustment in contract time, and, when negotiated prices are involved, shall provide for the contractor's signature indicating his acceptance."

Section 3-2.1.3 states: "Adjustments in payments for changes other than those set forth in Subsections 3-2.1.1 and 3-2.1.2 will be determined by agreement between contractor and Agency. If unable to reach agreement, the Agency may direct the contractor to proceed on the basis of Extra Work (Subsection 3-3)."

[4]Section 3-3, in part, states: "3-3.1 General. New or unforeseen work will be classed as 'extra work' when the Engineer determines that it is not covered by contract unit prices or stipulated unit prices.

As the district claims, California courts generally have upheld the necessity of compliance with contractual provisions regarding written "change orders." (*Acoustics, Inc.* v. *Trepte Constr. Co.*, 14 Cal.App.3d 887, 912 [92 Cal.Rptr. 723]; *A. Teichert & Son, Inc.* v. *State of Cal.*, 238 Cal.App.2d 736, 758 [48 Cal.Rptr. 225], overruled on other grounds in *E. H. Morrill Co.* v. *State of California*, 65 Cal.2d 787, 792 [56 Cal.Rptr. 479, 423 P.2d 551].) However, California decisions have also established that particular circumstances may provide waivers of written "change order" requirements. If the parties, by their conduct, clearly assent to a change or addition to the contractor's required performance, a written "change order" requirement may be waived. (*C. F. Bolster Co.* v. *J. C. Boespflug Etc. Co.*, 167 Cal.App.2d 143, 150-151 [334 P.2d 247]; *Frank T. Hickey, Inc.* v. *L.A.J.C. Council*, 128 Cal.App.2d 676, 682-683 [276 P.2d 52].)

In the present case, there is much evidence to support plaintiff's claim that the district intended to force it to utilize temporary pavement on Whittier Blvd. Trial testimony included: (1) prior to April 20, 1973, plaintiff's procedure for filling his contractual requirement to restore three traffic lanes daily had been to backfill excavations with hard packed sand (a procedure which was found by the trial court to comply with contract requirements); (2) on April 19, 1973, the district's senior construction specialist, T. D. Russi, issued a written memorandum directing plaintiff to provide a method of operation which would restore three traffic lanes on Whittier Blvd. at commute hours as required by contract; (3) on April 20, 1973, the district advised plaintiff that if, by April 22, he had not provided sufficient traffic lane restoration, the district

---

"3-3.2 Payment. When the price for the extra work cannot be agreed upon, the Agency will pay for the extra work based on the accumulation of costs as provided in Subsection 3-3.

"3-3.2.1 Daily Reports by Contractor. At the close of each working day, the contractor shall submit a daily report to the Engineer, on forms approved by the Agency, together with applicable delivery tickets, listing all labor, materials, and equipment involved for that day, and for other services and expenditures when authorized. An attempt shall be made to reconcile the report daily, and it shall be signed by the Engineer and the contractor. In the event of disagreement, pertinent notes shall be entered by each party to explain points which cannot be resolved immediately. Each party shall retain a signed copy of the report. Reports by subcontractors or others shall be submitted through the prime contractor.

"(a) Labor. The report shall show names of workmen, classification, and hours worked.

"(b) Material. The report shall describe and list quantities of materials used.

"(c) Equipment. The report shall show type of equipment, size, identification number, and hours of operation, including loading and transportation, if applicable.

"(d) Other Services and Expenditures. Other services and expenditures shall be described in such detail as the Agency may require."

itself would commence restoration procedures; (4) when plaintiff inquired of Russi how he must comply, he was verbally ordered to "fix it." (5) On April 22, the district itself placed temporary pavement on a portion of Whittier Blvd. and informed plaintiff that the cost incurred by district for such restoration would be deducted from plaintiff's final payment. Thereafter, plaintiff used temporary pavement to restore Whittier Blvd. at the end of the day and removed the temporary pavement before beginning work each morning.

There can be little doubt that the district did apply great pressure on plaintiff to use temporary pavement on Whittier Blvd. Although, as of April 20, 1973, the district refused to explicitly name the procedure it was ordering, it clarified, by example, the material it was then requiring when it took the initiative of restoring the traffic lane with temporary pavement. Since this procedure has been found to constitute a change in the original contract, it is clear that the district, by its conduct, exerted an intentional attempt to affect a contractual change without complying with the change order provision. "If the circumstances indicate that the parties intended to waive the provision, the subcontractor will be protected." (*Frank T. Hickey, supra,* at p. 683; 9 Cal.Jur.2d 296, § 13.) We find there is substantial evidence to support the trial court's finding that by its conduct, the district did intend to waive the contractual provision requiring a written change order and that plaintiff was justified in believing a valid change order had been issued.[5]

[5]It is noted that in *Acoustics, Inc., supra,* 14 Cal.App.3d at page 912, the court found "[c]ompliance with contractual provisions for written orders is indispensable in order to recover for alleged extra work." In *Acoustics,* where allegedly the contractor was ordered verbally to perform contractual changes, the court found that the state inspector who ordered the changes had no authority to waive the "written change order" contract requirement, and the contractor had erred in expecting payment without such written order from the state architect, the authority defined by contract.

In the present case, although the contractual authority was the state engineer and not the site inspector, the site inspector's order was not the only source of plaintiff's belief that a change order had been issued. He had received correspondence from the site inspector that the district considered him in violation of his contract for not taking adequate steps to restore the traffic lanes; he reasonably inferred that the sole adequate step which would satisfy the district at that time was his use of temporary pavement; he was informed that the district would take it upon itself to adequately restore these lanes if he did not do so; after being informed of the district's intentions, he witnessed the fact that the district did intend to carry out its threat of taking over restorative maintenance when it placed temporary pavement on plaintiff's construction area on April 22, 1973. At this point, the plaintiff was not relying solely on the inspector's authority, but also on the district's performance which, itself, affected a change of contractual terms. He properly concluded that a change order had been issued.

The district also argues that, even if the change order was waived, plaintiff lost his right to extra work payment when he failed to meet the technical prerequisites for payment under the extra work provision. This provision required the contractor to submit daily expenditure reports to the district while performing extra work, a procedure which plaintiff did not follow.

District interprets the "extra work" provision as defining conditions precedent to its own contractual obligation to pay plaintiff for extra work. Such conditions were found to exist in *Acoustics, Inc., supra,* 14 Cal.App.3d at page 912, where the court found a contractual provision had "established conditions precedent to the right of [the contractor] to claim or receive additional moneys for allegedly extra work, and [contractor's] failure to comply with these conditions releases the State from liability therefor." However, in *Acoustics, Inc.,* the contract had provided (p. 911): "Failure to [perform predefined conditions] shall constitute a waiver of any and all right to adjustment in compensation and contract time due to such work, and the Contractor thereafter shall be entitled to no additional compensation whatsoever for the performance thereof." This provision explicitly conditions the contractor's right to payment on his fulfillment of particular acts.

No such provision exists in the present case. Instead, contract section 3-3.2.1 merely defines one of many acts contractually required by the plaintiff. Here, without express contractual stipulation, it was proper for the court to consider all circumstances before determining whether the plaintiff's failure to supply daily reports had materially affected his contractual right to payment for extra work. In view of the finding that the district, by its conduct, waived its right to rely on the section 3-2 change order provision, it is unreasonable that plaintiff be held to terms deriving from this section. Section 3-2.1.3 of the change order provision states: "If unable to reach agreement, the Agency may direct the contractor to proceed on the basis of Extra Work (Subsection 3-3)." In that the district waived its right established by section 3-2, there was no reason to expect the section 3-2.1 reference to section 3-3 still applied.[6] One who waives or foregoes a right is precluded afterward from asserting

[6]It should also be noted that contract provision 3-2.1.3, which directs the parties to the extra work provision, defines "the Agency" as the party initiating recourse to the extra work provision. Nowhere was it claimed that the Agency "directed" plaintiff to proceed on this basis. Without the district's direction, it is not clear that plaintiff ever was technically obligated to initiate performance in compliance with the extra work requirement.

it. (*L. A. City Sch. Dist.* v. *Landier Inv. Co.,* 177 Cal.App.2d 744, 752 [2 Cal.Rptr. 662]; *Faye* v. *Feldman,* 128 Cal.App.2d 319, 328 [275 P.2d 121].) Moreover, it appears that the daily expenditure requirement is entirely dependent on the issuance of a change order. Since at the time the events took place, the district would not even admit a change order had been issued, it was entirely reasonable for plaintiff to have believed that the requirement for his daily submission of written expenditure reports was not applicable to the circumstances and that his records need only be preserved for a future time when it would be established that a change order had been issued.

At trial, plaintiff provided a fairly detailed record of costs incurred as a result of the district's change order. In addition, the testimony revealed that the district had provided constant supervision of the construction site and had ample notice of the extra work as it was performed. We affirm the court's finding that plaintiff did not waive his right to payment by his failure to present these records to the district on a daily basis while work was in progress.

The final issue we consider is one of an appropriate award of damages to plaintiff. In determining a figure which would constitute adequate payment to plaintiff for the extra work performed, the trial court relied on plaintiff's invoices for temporary pavement material and on his employee time cards covering the period during which work on Whittier Blvd. was undertaken. In using plaintiff's figures, the court assumed that all labor costs related to job codes representing placement and removal of temporary pavement and all material costs for temporary pavement delivered to Whittier Blvd. were costs attributable to extra work and thus required additional compensation by the district.

The district contends that the costs represented by plaintiff's records were overinclusive in that plaintiff admitted the figures included work done on areas other than the three traffic lanes, that is, they included work and materials for catch basins, street intersections and commercial accesses into markets and businesses along Whittier Blvd. Because any change order issued by the district only referred to a new method for keeping traffic lanes open at commute hours, the district maintains that costs for temporary pavement used on areas other than the three traffic lanes should not have been included as extra work costs.

The basic issue arising here is whether, as part of the change order, the district required temporary pavement to be applied to areas adjacent to the three traffic lanes on Whittier Blvd. Here there was conflicting evidence. The district's April 20, 1973, letter to the plaintiff related only to traffic lane maintenance. Mr. Russi, the district's site inspector, testified that he directed plaintiffs to keep business accesses and intersections open to traffic; however, he denied ordering that temporary pavement be applied to these areas. Mr. Veronesi, plaintiff's construction superintendent, testified that Mr. Russi did order him to place temporary pavement at intersections and business accesses.

■ When determinations of fact are made from conflicting evidence, unless there is no reasonable inference to support the determinations of the trial court, its findings are upheld. (*Val Strough Chevrolet Co.* v. *Bright,* 269 Cal.App.2d 855, 861 [75 Cal.Rptr. 363]; *Solomont* v. *Polk Development Co.,* 245 Cal.App.2d 488, 494-495 [54 Cal.Rptr. 22].) In this case, the court found that plaintiff was required by the district to apply temporary pavement, which was used to give access to cross streets and businesses. From the evidence, the court could reasonably infer that Mr. Russi had ordered plaintiff to use the temporary pavement for areas adjacent to the traffic lanes. ■ ■■■ We find no error in the trial court's interpretation that maintenance of intersections, catch basins and adjacent driveways by means of temporary resurfacing was included in the district's change order and required extra compensation.[7]

Lastly, the district maintains that if there was a change order issued, the result of that change order was to change the method used by plaintiff to keep the traffic lanes open, not to create an entirely new task. Because the change order resulted in replacing an old method with a new method, damages would be calculated properly by subtracting the costs of the old method from those of the new one, the difference being the additional compensation to which plaintiff is entitled. (*Asso. Lathing etc. Co.* v.

---

[7]We are faced here with the additional problem that plaintiff appears to have relied solely on Mr. Russi's statements for his belief that the adjacent areas were included in the district's change order. It is true that a subordinate's statements, by themselves, are insufficient to waive a written change order requirement. (*Acoustics, Inc., supra,* at p. 912.) In this case, however, the change order had already been issued (as evidenced by the district's conduct in threatening and carrying out its own resurfacing procedures and charging them to plaintiff); at this point in time, we find plaintiff was justified in relying on Mr. Russi's statements for further definition of the details of the change, particularly when the maintenance of the adjacent areas was so closely aligned to the maintenance of the three traffic lanes.

*Louis C. Dunn, Inc.,* 135 Cal.App.2d 40, 51 [286 P.2d 825]; *Richmond Wharf & Dock Co.* v. *Blake,* 39 Cal.App. 1, 2 [177 P. 508].)

A review of the record discloses that plaintiff introduced into evidence, through testimony of its bookkeeper, the cost of the labor, material and equipment employed in providing the temporary resurfacing on Whittier Blvd. His figures were supported by invoices and employee hourly time records. District objected to the evidence on the ground that it did not qualify under the business records exception to the hearsay rule because it did not delineate exactly what work was being done.[8] District's argument is erroneous. The invoices and time records were properly received in evidence, and the bookkeeper testified that the figures relied on related solely to the temporary resurfacing. If district wished to challenge this testimony, it was incumbent on it to do so through cross-examination and other rebuttal evidence. This district did not do. It merely tried to exclude the evidence, of which some, if not all, was proper in proving plaintiff's damages. Thus, the bookkeeper's testimony is uncontroverted and supports the judgment.

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

---

[8]District also raises this issue on appeal as grounds for reversal.