Filed 12/28/20  Pickard & Butters etc. v. Buttonwillow Recreation etc. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PICKARD & BUTTERS CONSTRUCTION, INC., | F078801 |
| Plaintiff and Appellant, | (Super. Ct. No. BCV-15-100179) |
| v. | |
| BUTTONWILLOW RECREATION & PARK DISTRICT, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Law Offices of F. Glenn Nichols and F. Glenn Nichols for Plaintiff and Appellant.

Clifford & Brown, John R. Szewczyk and Daniel T. Clifford for Defendant and Respondent.

-ooOoo-

**INTRODUCTION**

This appeal involves a dispute between a general contractor and a public agency over a public works contract for the improvement of a park in the unincorporated community of Buttonwillow. Plaintiff Pickard & Butters Construction, Inc. (PBC) filed suit against Buttonwillow Recreation & Park District (District) for, among other claims, breach of contract and for prompt payment penalties under Public Contract Code section 7107. PBC sought the unpaid balance due on the contract and additional sums for extra work outside the scope of the contract performed at District's request, and prompt payment penalties.

Prior to trial, the court granted District's motion in limine and excluded any evidence PBC performed extra work without a written change order based on theories of oral modification or waiver of the contract's written change order requirement, or evidence that PBC was entitled to payment for such extra work based on estoppel. In making this ruling, the court relied on two appellate cases: *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104 (*Katsura*) and *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332 (*P&D Consultants*), review denied April 13, 2011.

We conclude the written change order requirement in the parties' contract did not, as a matter of law, preclude PBC's claims for extra work pursuant to theories of oral modification, waiver, or by the doctrine of estoppel. Thus, PBC was entitled to present evidence supporting application of these theories and we reverse the judgment and remand for a new trial. We express no view whether PBC is entitled to any compensation for alleged extra work under any of these theories.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     The Park Improvement Project**

After a competitive bidding process required by statute, District awarded PBC a contract to update a 12-acre park in Buttonwillow, an unincorporated area in Kern

County. The parties executed an agreement on October 21, 2013, for a total of $913,921.40. The plans and specifications for the project were designed for District by Meyer Civil Engineering, Inc. (MCE), whose principal Richard Meyer was the engineer of record on the project. Meyer retained the services of Brett Dawson, a licensed Civil Engineer, to supervise the construction work.

### A.     Relevant Contract Provisions

Under the terms of the contract, PBC was to complete the work within 180 days followed by a 60-day maintenance period. The original agreed upon completion date was April 28, 2014.

Under section C-8, the contract provided that the engineer was to "give all orders and directions contemplated under the Contract." The engineer had authority to reject all work and materials which did not conform to the proper execution, and any discrepancies or misunderstandings as to the contract specifications were to be referred to the engineer who was to decide the matter in accordance with the true intent and meaning of the contract.

The contract also allowed the engineer to make necessary changes and request extra work by written order. Section C-10 was devoted to the topic of "Extra Work." If the engineer ordered work or materials outside the scope of the plans and specifications, the contractor was to perform such work. The contract stated that "[s]uch labor, materials and/or equipment will be classed as extra work and shall be ordered in writing before such work is started. No extra work will be paid for unless ordered in writing." If the *price* for extra work could not be ascertained before the order for extra work issued, the contractor could proceed with the extra work pursuant to the contract's schedule for compensable extra work costs.

In the event of a dispute between the engineer and the contractor over the scope of the contract, section C-29 stated a condition precedent to a contractor's claim of extra costs: "(b)  Claims for Extra Cost – If the Contractor claims that any instructions by

3.

drawings, or otherwise involve extra cost under this contract, he shall give the Engineer written notice thereof within fifteen (15) calendar days after the receipt of such instructions. Each such claim shall be in reasonable detail and shall state fully the basis of the claim and the amount of alleged extra cost incurred. Claims not so made within said period shall be deemed waived."

Within the first ten days of each calendar month during the project, the engineer was to provide to District a written estimate of all work done under the contract to date, together with any amounts due the contractor for extra work or approved claims for extra costs. District would then pay the contractor 95 percent of the amount of each progress estimate, payable by the 13th day of the succeeding month. The remaining five percent was to be retained until final completion and acceptance of the work under the contract.

B.      Change Order Process Followed

During the contract work, there were many items of extra work District approved and PBC completed. There were 17 change order *requests* (CORs) made by PBC, which were forwarded to Dawson. At trial, Dawson could recall only nine of the 17 CORs. For CORs 2 through 10, Dawson took the requests to District's monthly board meeting, made a recommendation to approve or deny, and District made a decision as to the extra work. Dawson then apparently orally directed PBC to undertake the work. After District board meetings where extra work was approved, the next monthly pay estimate issued by Dawson would reflect line items labeled as contract change orders. The monthly pay estimate, prepared by Dawson and signed by both Dawson and PBC's principal, Mark Butters, would indicate whether those line items of approved changes, along with other work within the scope of the contract, had been completed. If PBC completed change order items, they were marked on the estimate as items to pay; if the items were not yet completed, the estimate would indicate they had been approved but nothing was owing. The pay estimate was then sent to District for approval and payment. District's monthly board meeting minutes show when it approved the extra work for PBC's CORs 2 through

4.

10, but no written authorization by Dawson was furnished to PBC between the time District's board voted to approve and when the approval appeared on the next month's pay estimate.[1]

### C. Disputes About Project Specifications, Extra Work, and Completion

The contract was executed on October 21, 2013, and work commenced soon afterward. Disputes about the specifications arose quickly, one of which was whether native soil or imported soil was required for excavated tree wells.

Another dispute centered on extra turf grading work Dawson asked PBC to perform along Highway 58 and Meadows Street. District's board approved $5,000 for this work, it was listed as an approved change order on pay estimate 5, but then was removed from pay estimate 6.

Butters testified PBC was directed to perform work only along Highway 58, and it was initially limited to regrading and piling up the scalped materials without removal. According to Butters, District's General Manager, Marie Parsons, or Dawson directed PBC to do similar grading along Meadows Street. PBC ended up grading and removing the graded materials at a cost of approximately $16,000. Dawson said the board approved a maximum of $5,000 for the work, to which Butters objected as far under the actual cost of the work requested.

Dawson testified there was a change order for work along Highway 58; he had asked PBC to prepare a time and materials estimate for that additional work; Dawson gave that request to Parsons who in turn took it to District's board. The board approved work not to exceed $5,000, and the work had not been performed at the time Dawson forwarded the request to the board. It was Dawson's recollection that Ken Brinar, PBC's project manager, gave him the $5,000 figure for that extra work.

---

[1] There was conflict in the testimony and documentary evidence regarding PBC's COR 1.

5.

Dawson testified he approached PBC to see if it could use the regraded soil as part of the preparation for the hydroseeding. According to Dawson, it was PBC's obligation to haul the regraded materials away, but if PBC spread that excess soil on areas that had been damaged during the project, they could trade the value of that work. Dawson could not recall whether this was entirely an oral agreement or with whom he made that deal—nearly all of his conversations were with Brinar. In any event, that work-swap agreement was why he eliminated the $5,000 change order line item from pay estimate 6.[2]

There were also disputes about the degree to which hydroseeding was part of the original specifications, and whether PBC's failure to preserve the original sod and other turf damaged by PBC had caused the need for extensive regrading and hydroseeding. Meyer testified the specifications called for preservation of the park's existing sod by rolling it up, putting it in storage, and keeping it healthy until it could be placed back in the park.

Butters testified PBC had planned from the beginning to hydroseed the entire project after the work was completed, and that was how the project had been bid given the specifications. Butters claimed it was a "ridiculous specification" to cut the sod, save it for six months, and then place it back in the trenches—it would not have been possible to keep the sod alive during that time of the year.

Dawson testified PBC had been all over the existing turf during the course of the project construction with equipment and had destroyed much or all of it; PBC had an

---

**2**    In MCE's response to PBC's March 6, 2015, claim filed with District, MCE stated as follows: "Additional work was being considered by the District for grading behind the curb along Hwy. 58 and along Meadows Street. In anticipation of these costs, Brett Dawson included a new change order line in Pay Estimate No. 5 in the amount of $5,000,00. No payment was posted to this $5,000.00. Instead, later in the project an exchange of work value was agreed to and the change order was not needed, refer to item 15)b. Therefore, the line item was deleted on Pay Estimate No. 6. Estimates 2, 3, 4, 5 & 6 were technically short by $2,079.20. This was due [to] an error carried over from Pay Estimate No. 2. However, this was reconciled on Pay Estimate No. 7 when Liquidated Damages exceeded work value completed for that period."

obligation to maintain the existing lawn outside their work area, but failed to do so. Therefore, PBC had to hydroseed as a result of their mismanagement of the entire park, and PBC was instructed to prepare the ground prior to hydroseeding. Dawson said part of that ground preparation included rototilling the hard-pack and adjusting the soil's pH levels. While this was not a direct requirement of the contract documents, it was work Dawson felt was required as a result of PBC's inability to protect the existing landscape and assure viability of the new landscape. After hydroseeding, the grass did not appear healthy. Although the hydroseeding included fertilizer treatment, because the grass was not looking good, Dawson asked PBC to add fertilizer to the grass.

Then there were continued disputes over *why* the hydroseed was not germinating properly. PBC claimed the seed mix selected by Dawson was not appropriate for the soil or the seed mix sold to PBC by Horizon (a materials supplier) was defective. There were also conflicts about the need for fertilizer, pH adjustments to the soil, the sprinkler schedule, adjustments to the irrigation controller, the amount of water the hydroseed needed, and whether PBC's failures caused trees and shrubs to die.

### D.    Contractor Termination

At the end of April 2014 and just prior to hydroseeding, Dawson generated a memo with a list of project clean-up items to be completed prior to the last pay estimate submission, typically referred to as a punch list. Brinar testified Dawson told him if PBC prepared for hydroseeding and it was accepted, if discussed items of clean-up were finished, and if the repair stripping of the parking lot was completed, Dawson and Meyer would deem this substantial completion of the project. Dawson disputed ever telling anyone at PBC that the project was substantially completed.

On April 21, 2014, District's board extended the project completion date to May 8, 2014. Another punch list was issued by Dawson on May 7, 2014. When the project was not deemed complete on May 8, 2014, District began to impose liquidated damages. Dawson testified that as of May 8, 2014, he did not consider the 60-day maintenance

7.

period to have commenced. He believed the specifications indicated the maintenance period would begin when the project was deemed complete by District.

On June 25, 2014, Dawson issued a notice ordering PBC to follow a specific work schedule for remaining project tasks. The notice indicated that the failure to meet any of these deadlines would result in the formal filing of a "'notice to terminate the contractor.'"

District imposed $54,000 in liquidated damages from May 9, 2014, to July 2, 2014, when PBC took down its fencing around the park. On July 22, 2014, District issued a notice terminating PBC's employment as contractor under section C-6 of the contract for delay in completion.

District spent additional sums of money to complete the project and became involved in a pending lawsuit filed against District and PBC in November 2014 for money owed to Horizon for supplying the hydroseed. On December 29, 2014, District recorded a notice of completion of the project. Although there was outstanding money District owed to PBC on the final pay estimate, no payment to PBC was made. PBC claimed full payment of the outstanding contract price plus payment for extra work was due and owing by no later than February 2, 2015, and PBC filed a claim against District in March 2015, which District denied. PBC thereafter filed suit against District in May 2015 for breach of contract, among other claims.

## II.      Procedural Background

PBC's complaint against District was amended twice. Following summary judgment, two claims remained: breach of contract and prompt payment penalties under Public Contract Code section 7107. The court granted District's pretrial motion in limine to preclude PBC from presenting any evidence of uncompensated extra work without a written change order. The court concluded no evidence of extra work based on oral modification, waiver or estoppel was permitted pursuant to *Katsura*, *supra*, 155 Cal.App.4th 104 and *P&D Consultants*, *supra*, 190 Cal.App.4th 1332.

Following a bench trial, the court issued a statement of decision finding District breached the contract by failing to make final payment to PBC, but that no prompt payment penalties were owed. The court determined District was entitled to offset the contract price with liquidated damages, certain costs of completion, and for the money paid to settle the Horizon litigation, and judgment was entered in PBC's favor for breach of contract in the amount of $27,566.53.

## DISCUSSION

### I. Preclusion of Evidence of Oral Modification, Waiver, or Estoppel

PBC argues the trial court erred in excluding all evidence extra work was performed at District's request under theories of oral modification, waiver, or estoppel. "Generally, a trial court's ruling on an in limine motion is reviewed for abuse of discretion. [Citation.] However, when the issue is one of law, we exercise de novo review." (*Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist*. (2007) 149 Cal.App.4th 1384, 1392; accord, *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1277; see *McIntyre v. The Colonies-Pacific, LLC* (2014) 228 Cal.App.4th 664, 670 ["'While trial judges ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine [citation], a court's discretion is limited by the legal principles applicable to the case.'"].)

### A. Background

PBC contends California Supreme Court authority recognizes that private and public contracts are subject to the same rules of interpretation. Thus, regardless of whether the contract involves a public entity, written change order requirements for approving extra work are subject to modification by oral agreement or the parties' conduct under Civil Code section 1698. The written change order requirements may also be waived by the parties' conduct, and under particular factual circumstances, the costs of extra work performed by a contractor may be awarded without a written change order

9.

under a theory of estoppel. To the extent *Katsura* and *P&D Consultants* hold differently, PBC argues they are factually distinguishable and/or contravene decisions issued by the California Supreme Court. PBC maintains *Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist.* (1979) 88 Cal.App.3d 579 (*Weeshoff*) properly applied principles of contract interpretation to conclude a written change order requirement in a public contract had been waived by the public entity, and the trial court should have followed *Weeshoff* rather than *Katsura* and *P&D Consultants* in deciding District's motion in limine.

PBC argues Dawson and Parsons issued oral change/extra work orders that modified the contract and caused PBC to incur extra costs, District waived the written change order requirement by approving and paying for other extra work without a written change order, and/or otherwise made promises that induced PBC to perform extra work that entitle PBC to recover under a theory of estoppel.

District disputes that any evidence of oral modification, waiver or estoppel is admissible to prove extra work was authorized by District due to the written change order requirement. District contends that as a matter of law under *P&D Consultants* and *Katsura*, written change order requirements in public contracts cannot be modified orally or through conduct, waiver cannot apply, and recovery under the doctrine of estoppel is not permitted.

### B. Legal Framework

#### 1. General Contract Principles

Pursuant to Civil Code section 1698, a contract in writing may be modified by an executed oral agreement or an oral agreement supported by new consideration so long as the statute of frauds is satisfied; and nothing in the statute precludes the application of law concerning estoppel or waiver, among other principles. (Civ. Code, § 1698, subds. (b)–(d).)

Construction and works contracts often contain a provision that any extra work outside the scope of the contract performed by the contractor will be compensated only

10.

if a prior written change order was issued by the owner.  If the contractor fails to obtain a written change order approving extra work, the contractor may argue the parties orally modified the written change order requirement.  (*Healy v. Brewster* (1967) 251 Cal.App.2d 541, 552.)  The contractor may also argue the owner freely and knowingly gave up the right to enforce the written change order requirement by oral or written agreement or by conduct showing the owner clearly gave up the right.  (*Ibid.*; see *Frank T. Hickey, Inc. v. L.A.J.C. Council* (1954) 128 Cal.App.2d 676, 683 (*Frank T. Hickey, Inc.*).)

The question presented by PBC is whether a written change order requirement in a *public* contract is subject to the principles of oral modification, waiver, or whether recovery for extra work without a change order is available under a theory of estoppel. As we discuss below, because public contracts are highly regulated and because public entities are governed by differing authority shaping the public entity's ability to contract both in scope and mode, the ability to freely modify public contracts is very limited and will often be precluded.  Nevertheless, where no statute, code, charter or other legal authority precludes it, or where no adopted public policy would be effectively nullified by it, theories of oral modification, waiver, or certain equitable remedies *may* be available in the public contract context.

### 2.     Relevant California Supreme Court Public Contract Decisions

The California Supreme Court has observed that California cases do not impose special rules of law simply because a governmental body is a party to a contract, and typically public contracts are subject to the same rules of interpretation as contracts between private parties.  (*M. F. Kemper Const. Co. v. City of L. A.* (1951) 37 Cal.2d 696, 704–705 (*Kemper*); see Civ. Code, § 1635 ["All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this code."].)

However, public contracts are governed and highly regulated by an array of statutes depending on the type of contract at issue, and public entities are subject to

11.

various statutes, codes, charters, ordinances, and regulations that govern the power and scope of their ability to contract. (See, e.g., *Domar Electric Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171 ["[A] charter city may not act in conflict with its charter. [Citations.] Any act that is violative of or not in compliance with the charter is void."].) General contract principles may yield and theories of recovery may be deemed unavailable in the face of specific legal restrictions on public contracts and the public entity involved.

In one of its early cases considering a public works contract, the California Supreme Court held ratification or estoppel was an available remedy even if the contract was improper under the entity's charter. (*Argenti v. City of San Francisco* (1860) 16 Cal. 255, 266 (*Argenti*).) The court's reasoning in this regard rested on the proposition that those doctrines of recovery were applicable to public corporations to the same extent as private corporations. (*Ibid.*)

Two years after *Argenti*, however, the court reversed course in *Zottman v. San Francisco* (1862) 20 Cal. 96 (*Zottman*). Extra work was directed on a public works contract, but without competitive bidding as required by the city's charter. (*Id.* at p. 101.) As a result, the court held the contract for extra work was void, the contract could not be ratified nor was estoppel an available remedy. (*Id.* at pp. 105–106.) The court noted *Argenti* did not control because "the Justices who pronounce[d] the judgment [in *Argenti*] concurred only in the conclusion … [but] differed entirely in the grounds upon which they rested the liability of the city[.]" (*Id.* at p. 108.) Justice Cope, who authored *Argenti*, delivered a concurring opinion in *Zottman* and stated that "upon further reflection, I am convinced of the error of the reasoning upon which my conclusions were arrived at [in *Argenti*]." (*Ibid.* (conc. opn. of Cope, J.).) Justice Cope concluded the city could not act contrary to its charter and, thus, no recovery on the extra work could be obtained under any theory of implied liability. (*Id.* at pp. 108–109 (conc. opn. of Cope, J.).)

12.

More than 50 years later, the court reaffirmed the rule applied in *Zottman*: contracts that are formed beyond the powers of the public entity, or executed outside the legally required mode, are void. (*Reams v. Cooley* (1915) 171 Cal. 150, 154–157 (*Reams*).) The *Reams* court held such contracts cannot be enforced, and no recovery under an implied theory for quantum meruit can be obtained.[3] *Reams* involved a public works contract that had not been subject to the required competitive bidding process. (*Reams*, *supra*, at pp. 151–152.) When the public entity discovered the error, it refused to pay for the work performed under the contract, and the contractor filed suit. (*Id.* at p. 151.) The trial court denied recovery, and the Court of Appeal affirmed. (*Id.* at pp. 152–153.) On appeal before the California Supreme Court, the contractor argued that even if the contract was void due to the public entity's lack of power to enter into such a contract without proper bidding, he was still entitled to recover under an implied contract theory in an action on quantum meruit. (*Id.* at p. 153.)

The court rejected this argument on the ground that "no implied liability can arise for benefits received under a contract made in violation of the particularly prescribed statutory mode." (*Reams*, *supra*, 171 Cal. at p. 154.) "Where the statute prescribes the only mode by which the power to contract shall be exercised, the *mode* is the *measure* of the power. A contract made otherwise than as so prescribed is not binding or obligatory as a contract and the doctrine of implied liability has no application in such cases." (*Ibid.*) Thus, the court concluded that "[n]o contract, either expressly or impliedly, could be entered into by the [public entity] except with the lowest bidder after advertisement, and, of course, no implied liability to pay upon a *quantum meruit* could exist where the

---

[3]    "Quantum meruit" refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered. (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) To recover in quantum meruit, a party need not prove the existence of a contract, but must establish the circumstances were such that the services were furnished with some expectation by both parties that compensation for those services would be made. (*Ibid.*)

13.

prohibition of the statute against contracting in any other manner than as prescribed is disregarded." (*Id.* at p. 156.)

Following *Reams*, our high court reiterated that even if competitive bidding requirements are met or excused, if the contract is executed in a mode not within the public entity's power, the contract is similarly void at inception and no doctrine of implied liability can be invoked for recovery. (*Los Angeles Dredging Co. v. Long Beach* (1930) 210 Cal. 348 (*Los Angeles Dredging*).) "Certain general principles have become well established with respect to municipal contracts, … (1) The most important one is that contracts wholly beyond the powers of a municipality are void. They cannot be ratified; no estoppel to deny their validity can be invoked against the municipality; and ordinarily no recovery in *quasi* contract can be had for work performed under them. (2) It is also settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable." (*Id.* at p. 353, citing *Reams*, *supra*, 171 Cal. at p. 150, boldface omitted.)

Based on these principles, the court in *Los Angeles Dredging* concluded that two oral contracts entered into by the city manager violated the charter's requirement that such contracts be made only after competitive bidding. However, another charter provision allowed the city council to adopt a resolution authorizing the city manager to enter into a contract for emergency work without bids. Although no such resolution existed at the time the city manager entered into oral contracts for emergency work, the city council later passed a resolution ratifying the contracts made by the city manager as emergency acts. (*Los Angeles Dredging*, *supra*, 210 Cal. at p. 358.) The court held the doctrine of ratification applied because the ratification was within the powers of the municipality and performed in the manner originally prescribed. (*Id.* at pp. 358–359.)

Without the emergency exemption from competitive bidding, however, the contract would not have been subject to ratification because the competitive bidding

14.

requirements could not be satisfied after the fact.  (*Los Angeles Dredging*, *supra*, 210 Cal. at p. 359.)  When bidding requirements are not satisfied, that contract is void at inception, there can be no recovery under an implied contract theory, the contract cannot be ratified, and no estoppel may be invoked against the municipality to deny its validity.  (*Miller v. McKinnon* (1942) 20 Cal.2d 83, 87–88 (*Miller*).)[4]  *Miller* observed that "[p]ersons dealing with the public agency are presumed to know the law with respect to the requirement of competitive bidding and act at their peril.…  If, as we have seen, the contract is absolutely void as being in excess of the agency's power, the contractor acts at his peril, and he cannot recover payment for the work performed .…"  (*Miller*, *supra,*. at p. 89.)

More recently, our Supreme Court held that when application of a theory of recovery generally available in private party contracts accomplishes an end run around statutory public contracting requirements (specifically, competitive bidding statutes), impairs the public policy underpinning the statutes, and implicates other public policy concerns, that theory of recovery is not applicable in the public contract setting.  (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228 (*Amelco*).)

---

[4]     *Miller* expressly overruled *Contra Costa Water Co. v. Breed* (1903) 139 Cal. 432 and *Sacramento County v. Southern Pacific Co.* (1899) 127 Cal. 217 for the proposition that a municipality may not recover from the contractor payments made under a contract that is void for lack of compliance with the statutory bidding requirements.  The *Miller* court explained that denying recovery to the municipality under such circumstances is based on estoppel, which does not apply when there is failure to comply with the bidding statute.  (*Miller*, *supra*, 20 Cal.2d at pp. 90–91.)  The court reasoned that the doctrine of implied liability applies where the general power by the public entity to contract on a subject exists and the form and manner of doing so is not expressly provided by charter or statute; but when the power to make a contract is statutorily limited to a prescribed method, any other method of contracting is expressly or impliedly prohibited and no implied liability can attach.  (*Id*. at pp. 91–92.)  A limited exception to this rule was enacted by the Legislature in 2004 under Public Contract Code section 5110, which allows a contractor to recover reasonable costs, excluding profit, for work performed under a contract later deemed invalid due to a defect in the bidding process caused solely by the public entity.

In *Amelco*, an electrical contractor (Amelco) argued it had been subject to so many change orders on a public works project and the project was so different from what was originally specified by the city, the city had abandoned the contract. (*Amelco*, *supra*, 27 Cal.4th at p. 235.) Although private parties may impliedly abandon a contract when they fail to follow change order procedures and when the final product differs substantially from the original, the court concluded the abandonment doctrine was fundamentally inconsistent with the purpose of the competitive bidding statutes. (*Amelco*, *supra*, 27 Cal.4th at pp. 235, 239–240.) If the contract were set aside under the abandonment theory, then Amelco would be like a contractor who performed under a void contract. (*Id.* at p. 239.) The city could not simply contract for a quantum meruit payment, free from any other pre-contract requirements such as bidding the project. (*Id.* at pp. 238–239.)

The court explained bidding statutes were meant to protect the public, but permitting recovery under abandonment would punish taxpayers by allowing changed projects to be negotiated without the benefit of any competitive bidding. (*Amelco*, *supra*, 27 Cal.4th at pp. 239–240.) Practical considerations such as the difficulty of ascertaining precisely when abandonment of a contract occurs could delay notice of claims until the end of the project, creating uncertainty in budgeting and financing public projects. (*Id.* at p. 240.) Moreover, abandonment would incentivize contractors to bid unrealistically low with the hope of prevailing on an abandonment claim, based on the numerous changes inherent in any large public works project. (*Id.* at pp. 240–241.) Notably, the court rejected Amelco's argument that abandonment applied because the city was liable for a breach of its agreements in the same manner as a private party. The court observed that while it was true the city was liable for breach in the same manner as a private party, recovery for specific breach is very different from abandonment where the entire contract is set aside and the contractor seeks recovery on a quantum meruit basis from the beginning of the project onward. (*Id.* at p. 242.)

16.

But *Amelco* does not bar all equitable remedies against public entities. If a theory of equitable recovery does not subvert public contracting law or the operation of a public policy adopted to protect the public, such recovery may be available. (*Kemper*, *supra*, 37 Cal.2d 696.) *Kemper* involved a mistake in a company's (Kemper) bid for a public works project, which had the effect of omitting over $300,000 from the bid that was deemed irrevocable under the city's charter. (*Id.* at pp. 699–700.) Having been alerted by Kemper to the mistake immediately after submission of the bid, the city knew the bid was in error, but accepted it anyway at the erroneously low price and attempted to hold Kemper to the mistake despite that it represented nearly one-third of the contract price. (*Id.* at p. 700.) Kemper refused to enter a contract at the mistaken bid price, so the city awarded the contract to the next lowest bidder, demanded forfeiture of Kemper's bond, and Kemper filed suit to cancel its bid and obtain discharge of the bond. (*Ibid.*) The trial court entered judgment for Kemper, and, on appeal, the California Supreme Court upheld the judgment. (*Id.* at pp. 700, 702–705.)

The *Kemper* court reasoned that the equitable remedy of recission was available under the circumstances. The mistake was of the clerical type from which recission is available, and the statement in the bid form that bidders would not be released on account of errors could be given effect by interpreting it as relating to errors of judgment rather than clerical mistakes. (*Kemper*, *supra*, 37 Cal.2d at pp. 703–704.)

The court also rejected the city's literal interpretation that its charter precluded bids from being withdrawn. The court noted that out-of-jurisdiction cases held rescission for mistake and relief from forfeiture may be had in public construction contracts, even when there were express contract or charter provisions making the bids irrevocable; and California cases had uniformly refused to apply a different or special rule simply because a governmental body is a party to a contract. (*Kemper*, *supra*, 37 Cal.2d at pp. 704–705.)

Beyond recission for unilateral mistake, promissory estoppel has also been deemed available against a public entity in the pre-contract bidding context. (*Kajima/Ray*

17.

*Wilson v. Los Angeles County Metropolitan Transportation Auth.* (2000) 23 Cal.4th 305 (*Kajima*).)  The court in *Kajima* held a responsible bidder on a public contract who was wrongfully denied a contract could pursue damages against the public entity under a theory of promissory estoppel, but only bid preparation costs and not lost profits could be recovered.  (*Id.* at p. 308.)

The court explained that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental entity where it would defeat the effective operation of a statute or policy adopted to protect the public.  (*Kajima*, *supra*, 23 Cal.4th at p. 316.)  Because the competitive bidding statutes are enacted for the benefit of property holders and taxpayers, and were not meant to benefit or enrich bidders, they must be construed and administered to accomplish that purpose.  (*Id.* at pp. 316–317.)  Thus, awarding lost profits to a disappointed bidder would unduly punish the taxpaying public and provide an unfair windfall to bidders for efforts they did not make and risks they did not take.  (*Id.* at p. 317.)

In responding to the bidder's argument that lost profits should be available because public and private contracts are governed by the same principles, the court concluded that, although that "may be" so, in the case of a wronged bidder there is no contract.  (*Kajima*, *supra*, 23 Cal.4th at p. 317.)  For recovery under a theory of promissory estoppel, the court explained it was responsible to determine the remedy justice required by considering the social consequences of any chosen remedy.  (*Id.* at pp. 317–318.)  The court reasoned allowing lost profits for a wrongfully denied contract could drain the public fisc in response to mere carelessness on the part of low level government officials.  (*Id.* at p. 318.)

*Kemper*, *Amelco*, and *Kajima* reflect twin principles that ordinary rules of implied contracts or equitable doctrines may be applied against the government (see *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1176 (*Retired Employees*); *U. S. Fid. & Guar. Co. v. State Bd. of Equal.* (1956) 47 Cal.2d

18.

384, 388–389), but only so long as that application does not effectively nullify a strong rule of policy adopted for the benefit of the public (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493; *Amelco*, *supra*, 27 Cal.4th at pp. 239–240). When it comes to public entity contracts that are ultra vires of a public entity's legal authority to contract or a specified mode of contracting, it is clear the contract is void and no doctrine of estoppel or implied-in-fact contracts will apply. (See e.g., *Reams*, *supra*, 171 Cal. at pp. 156–157; *Zottman*, *supra*, 20 Cal. at pp. 102–105; *Los Angeles Dredging*, *supra*, 210 Cal. at p. 353 [it is "settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable"].)

With this legal backdrop, we consider how written change order requirements in public contracts were considered in *Weeshoff*, *Katsura*, and *P&D Consultants*.

### 3. California Courts of Appeal

The parties' dispute focuses on which of three California appellate cases govern PBC's claim the written change order requirement here was modified orally or by conduct, was waived by District, and/or that PBC may attempt to obtain recovery under the doctrine of estoppel. In *Weeshoff*, the court held a public entity's conduct constituted waiver of a contractual written change order requirement authorizing extra work. (*Weeshoff*, *supra*, 88 Cal.App.3d at pp. 589–590.) *Katsura* and *P&D Consultants* distinguished *Weeshoff* and held no modification of a contract or its written change order requirement could be established. *P&D Consultants* broadly held "public contracts requiring written change orders cannot be modified orally or through the parties' conduct." (*P&D Consultants*, *supra*, 190 Cal.App.4th at p. 1335.)

*Weeshoff* involved a contractor who brought suit against a flood control district to recover damages purportedly due for extra work performed on a competitively bid public works contract. (*Weeshoff*, *supra*, 88 Cal.App.3d at p. 582.) The project involved construction on a section of Whittier Boulevard that was also a state highway. (*Id.* at

19.

p. 583.) The state required three lanes of traffic remain open on Whittier Boulevard during commuting hours and prohibited the use of temporary resurfacing on state highways. The contract likewise restricted the use of temporary resurfacing on state highways, and required any change orders be in writing. (*Id.* at pp. 583, 588.)

During the project, a dispute arose about the three-lane requirement on a section of Whittier Boulevard. (*Weeshoff*, *supra*, 88 Cal.App.3d at p. 584.) Weeshoff had maintained the lanes with hard sand compact, but the district sent a memo stating sand was insufficient and ordered Weeshoff to fix it. (*Ibid.*) Weeshoff received another letter from the district the next day stating that if the road surface was not restored sufficiently, the district would restore it at Weeshoff's expense and cancel the contract. (*Id.* at pp. 584–585.) About three days later, the district placed 18 tons of temporary resurfacing material at the site and later informed Weeshoff the temporary resurfacing costs would be subtracted from the final payment. (*Id.* at p. 585.) Disputes over the temporary pavement continued, and Weeshoff's project superintendent was purportedly instructed by the district's site manager to place temporary pavement at certain other locations. (*Id.* at pp. 586, 592.) No written change orders were issued regarding the temporary pavement. (*Id.* at p. 586.) The district ultimately refused to pay the extra costs associated with the temporary pavement, Weeshoff filed suit, and the trial court awarded Weeshoff damages for the extra costs incurred from the use of temporary pavement. (*Ibid.*)

On appeal, the court affirmed the trial court's findings that under these circumstances, the temporary resurfacing ordered by the district constituted a change in the contract terms; that by its conduct in threatening to cancel the contract if the hard-packed sand was not replaced and dumping 18 tons of temporary pavement at the job site, the conduct constituted a change order, and the district intended to waive the contractual provision requiring a written change order; and that the contractor was justified in believing the district had issued a valid change order through its conduct. (*Weeshoff*, *supra*, 88 Cal.App.3d at pp. 586–591.)

20.

The court observed that while California cases have generally upheld the necessity of compliance with contractual provisions regarding written change orders, written change order requirements may be waived if, by their conduct, the parties clearly assent to a change. For this proposition, the court cited two decisions involving private party contracts. (*Weeshoff*, *supra*, 88 Cal.App.3d at p. 589, citing *C. F. Bolster Co. v. J. C. Boespflug Etc. Co.* (1959) 167 Cal.App.2d 143, 150–151 & *Frank T. Hickey Inc.*, *supra*, 128 Cal.App.2d at pp. 682–683.) The court reasoned the district had applied great pressure on Weeshoff to use temporary pavement, and dumping 18 tons of pavement on the roadway was conduct showing an intentional attempt to change the contract without a change order. (*Weeshoff*, *supra*, at pp. 589–590.) As a result, Weeshoff was permitted to recover its costs associated with the extra work performed without a written change order. (*Id.* at p. 592.)

Twenty-eight years after *Weeshoff*, a different division of the Second District Court of Appeal decided *Katsura*. Katsura entered into an engineering consultant contract with the city which stated the maximum the city would pay for those services was $18,485 and required any modifications to be made only by mutual written consent of the parties. (*Katsura*, *supra*, 155 Cal.App.4th at p. 106.) The contract also authorized special work up to $1,850 for services not within the project scope. (*Ibid.*) Payments for such work were only to be made after issuance of a written notice to proceed signed by the city engineer. (*Ibid.*) Katsura's first invoice to the city was for $2,943.25, which was paid; his second invoice was for $12,621.75, which was paid; his final invoice was for an additional $23,743.75, which the city refused to pay because it was beyond the contract price and it included unauthorized work. (*Id.* at pp. 106–107.)

Katsura filed suit for money due, common count, account stated, and open book. (*Katsura*, *supra*, 155 Cal.App.4th at p. 107.) After a bench trial, the court found Katsura was entitled to recover judgment against the city for $2,920, the remaining amount of the $18,485 authorized under the contract. Katsura appealed arguing the full amount of the

21.

final invoice was due because the city breached the contract, waived its right to enforce the contract, or the contract was orally modified to authorize the special work. (*Ibid.*) The appellate court rejected each argument. (*Id.* at pp. 108–111.)

The court first explained the city's charter required city contracts to be made in writing, approved by the city council, and signed on behalf of the city by an officer designated by the council. (*Katsura*, *supra*, 155 Cal.App.4th at p. 108.) The charter permitted the city to pass a resolution or ordinance allowing the city manager to authorize contracts with or without a writing for the acquisition of equipment and other items within a budget approved by the council. (*Ibid.*) By resolution, the city manager was authorized to enter into contractual relationships up to $25,000 for the relevant fiscal year. (*Ibid.*) The city manager had delegated his authority to sign contracts to department heads, including the public works director who signed Katsura's contract on behalf of the city. (*Ibid.*)

The court then explained no contract could be enforced against the city that its charter prohibited. (*Katsura*, *supra*, 155 Cal.App.4th at pp. 108–109.) Katsura claimed the extra work he performed, as reflected on the third invoice, had been requested by a city engineer and an outside consultant, and these requests amounted to an oral modification of the contract. (*Id.* at p. 108.) The court observed there was no provision in the charter for the execution of oral contracts by employees of the city who do not have requisite authority; thus, these purported oral agreements were void. (*Id.* at p. 109.)

As to Katsura's theory of recovery based on an implied-in-law contract, the court held that because the oral agreements were void under the charter, no implied-in-law or quasi-contract theory could apply. (*Katsura*, *supra*, 155 Cal.App.4th at pp. 109–110.) The court explained that as held by the California Supreme Court, "'"'the law never implies an obligation to do that which it forbids the party to agree to do.'"'" (*Id.* at p. 110, quoting *Reams*, *supra*, 171 Cal. at p. 156; accord, *Zottman*, *supra*, 20 Cal. at p. 106; *Amelco*, *supra*, 17 Cal.4th at p. 235.) The court cited *Amelco* for the proposition

that contracts disregarding applicable code provisions are beyond the power of the city to make.  (*Katsura*, *supra*, at p. 110.)

Katsura relied on *Weeshoff*, but the court found *Weeshoff* inapplicable and factually distinguishable in several regards.  (*Katsura*, *supra*, 155 Cal.App.4th at pp. 110–111.)  The *Katsura* court also questioned the viability of *Weeshoff*'s statement that written change order requirements could be waived by the parties' conduct because the cases *Weeshoff* cited for this proposition involved private contracts, not public contracts.  (*Katsura*, *supra*, at p. 111.)  Given that the oral modification alleged by Katsura was prohibited by the city's charter, the "great weight of authority" (*ibid.*) was contrary to *Weeshoff* in this regard.  The "great weight of authority" referred to in *Katsura* included *Reams*, *Zottman*, *Amelco* and *Los Angeles Dredging*, among others. (See *Katsura*, *supra*, at pp. 108–110.)

Finally, the court noted Katsura was not the victim of an innocent mistake:  he admitted he performed the extra work knowing it was outside the scope of the contract, and he had actual knowledge of the process for obtaining authorization for extra work because he had been involved with the city on a previous contract and had submitted written requests authorizing extra work.  (*Katsura*, *supra*, 155 Cal.App.4th at p. 111.)

The holding in *Katsura* was extended by the court in *P&D Consultants*.  There, a civil engineering firm (P&D) brought suit against the City of Carlsbad for breach of contract, breach of implied contract, quantum meruit, and violation of prompt payment statutes, seeking to recover for services on the redesign of a municipal golf course. (*P&D Consultants*, *supra*, 190 Cal.App.4th at pp. 1336–1337.)  The parties' written contract defined the scope of work and set a contract price.  (*Id.* at p. 1336.)  Importantly, it also provided that there could be no amendments, modifications or waivers of the contract terms absent a written agreement signed by both parties, and it contained an integration clause that the contract and any written agreements thereto embodied the parties' entire agreement.  (*Ibid.*)

During the course of the work, the parties entered into five different amendments that increased the contract price. (*P&D Consultants*, *supra*, 190 Cal.App.4th at pp. 1336–1337.) In each of the first four amendments, P&D would submit a proposed change order with a fixed contract price to the city's project manager (Cahill) and he would provide the city with the information for the preparation of an amendment. (*Id.* at p. 1336.) Usually, the city took several weeks to execute an amendment, and Cahill often authorized P&D to begin the extra work before it received the executed amendment. (*Ibid.*)

The fifth written amendment resulted from a series of negotiations between P&D and Cahill. (*P&D Consultants*, *supra*,. 190 Cal.App.4th at pp. 1336–1337.) P&D sought additional money to complete the contract, but Cahill communicated there was only $100,000 left in the budget, and no further costs would be authorized nor should be needed to finish the design package. (*Id.* at p. 1337.) As finally approved, the fifth amendment authorized $99,810 of additional work. (*Ibid.*) The written amendment stated the intent of the parties was that the amendment was to provide all final and complete services by the city to bid the project, and that no additional compensation was to be requested nor would it be approved by the city related to this scope of work. (*Ibid.*)

P&D began work several weeks before the city executed the fifth amendment, at Cahill's direction, which had been the parties' customary practice with prior amendments. (*P&D Consultants*, *supra*, 190 Cal.App.4th at p. 1337.) After the fifth amendment was executed, however, P&D sought more money from the city for additional work purportedly not included in the amendment. (*Ibid.*) The city refused to pay, and P&D filed suit seeking to recover another $100,000 for extra work it performed outside the scope of the fifth amendment. (*Ibid.*)

P&D's trial theory was that the contract's written change order requirement was modified by Cahill's oral authorization of the extra work for which it sought payment, and by the parties' conduct in handling the amendments. (*P&D Consultants*, *supra*, 190

Cal.App.4th at p. 1337.) Over the city's objection, the jury was instructed on P&D's oral modification theory of breach, and the jury returned a verdict for P&D. (*Id.* at p. 1339.) The city appealed after posttrial motions were denied, and argued the trial court erred in finding the contract could be modified orally or through the parties' conduct in handling the amendments and allowing the matter to go to the jury on that theory. (*Id.* at pp. 1335, 1339.) The city argued there was no written change order for the extra work P&D performed after the fifth amendment, in violation of the contract itself and Government Code section 40602, which required a general law city (as Carlsbad was at that time) to execute its contracts with the signature of the mayor or a designee as provided by ordinance. (*Id.* at p. 1335, fn. 1.)

Relying entirely on *Katsura*, the court concluded that while *Katsura* involved a purported oral modification of a public contract, its reasoning was applicable to a purported modification through conduct—implied-in-fact. (*P&D Consultants*, *supra*, 190 Cal.App.4th at pp. 1340–1341.) The court explained the parties' contract limited the city's power to contract to the prescribed method, and by relying on Cahill's oral authorization or direction to perform extra work without a change order, P&D acted at its peril. (*Id.* at pp. 1341–1342.) The court noted the purpose of including a written change order requirement in a municipal works contract is to protect the public fisc from the type of situation that had occurred between the parties. (*Id.* at p. 1342.) Notably, however, the court did not reach the city's argument that any contract modification P&D alleged with respect to the extra work would be void under Government Code section 40602 because it was not signed by the mayor or his designee. (*Id.* at p. 1335, fn. 1.)

The court distinguished *Weeshoff* factually, noting the parties' contract in *Weeshoff* included a provision allowing extra work to proceed without a fully agreed-upon change order while P&D's contract with the city unambiguously prohibited commencement of extra work without written authorization. (*P&D Consultants*, *supra*, 190 Cal.App.4th at p. 1342.) The court also echoed *Katsura*'s criticism of *Weeshoff* as

25.

citing contract cases involving private parties and not public entities, and that the legal proposition a written change order requirement could be waived was "'contrary to the great weight of authority .…'" (*Id.* at p. 1342, quoting *Katsura*, *supra*, 155 Cal.App.4th at p. 111.)

Finally, the court distinguished *Kemper*, *supra*, 37 Cal.2d at pages 699 to 700, because P&D's case did not concern relief from a mistaken bid that caused the municipality no damage. (*P&D Consultants*, *supra*, 190 Cal.App.4th at p. 1343.) While *Kemper* noted California cases have refused to apply special rules of law simply because a government body is party to the contract, the court was unconvinced this meant that contract modification in the private sector applies equally to public contracts, pointing to *Amelco*'s acknowledgment that "'public works contracts are the subject of intensive statutory regulation and *lack the freedom of modification present in private party contracts*.'" (*P&D Consultants*, *supra*, at p. 1343, quoting *Amelco*, *supra*, 27 Cal.4th at p. 242.)

## C.    Analysis

PBC contends that, given the longstanding prohibition on public entities contracting in a manner or mode outside their authority as limited by charter, statute, or code, *Katsura* could not have been decided differently. However, because there were no such limits on the contracting authority of the public flood district in *Weeshoff*, and because no special rules of interpretation apply to public contracts simply because one of the parties is a public entity, the principle of waiver was properly applied in *Weeshoff*. PBC argues the holding in *P&D Consultants* is not supported by *Katsura* because there was no similar statute, charter, or code prohibiting the city from entering into implied-in-fact contract modifications.

In many respects, *Katsura* is a straightforward application of the principles recognized in *Zottman*, *Reams*, and *Los Angeles Dredging*: a public entity contract is void if entered into through a prohibited mode, and the contract cannot thereafter be

26.

enforced under an implied-in-law or quasi-contract theory. *Weeshoff*, on the other hand, involved the Los Angeles Public Flood District, which is a public entity not governed by the same charter requirements as the City of San Buenaventura in *Katsura*. The facts of *Weeshoff* do not indicate any legal prohibition on the district's ability to modify its agreement with Weeshoff through its conduct and waive the written change order requirement. The long line of authority that dictated the outcome in *Katsura* simply was not relevant to the facts in *Weeshoff*.

*Katsura* noted the viability of *Weeshoff* was questionable in holding that the application of waiver could apply to public contracts. (*Katsura*, *supra*, 155 Cal.App.4th at p. 111.) But, rather than stating a broad rule that no implied contract or waiver could ever be recognized in the public contract context, *Katsura*'s statement in this regard is better understood as recognizing the reality that the doctrine of waiver applied in *Weeshoff* is unlikely to be applicable in many public contracts due to the laws that restrict and govern public entities' contracting abilities. Such an interpretation of *Katsura*'s discussion of *Weeshoff* is consistent with the observation in *Amelco* that public contracts lack the freedom of modification present in private party contracts (*Amelco*, *supra*, 27 Cal.4th at p. 242), and the recognition in *Retired Employees* that government entities may be bound by implied-in-fact contracts so long as no statute or law prohibits it (*Retired Employees*, *supra*, 52 Cal.4th at p. 1176).[5] Neither the facts of *Katsura* nor the case authority underpinning its determination preclude any and all oral modification of a

[5]    Although dicta in *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425 characterized *Katsura* as holding "*all* implied contracts against public entities are barred because, by definition, they have not formally been approved by the entity" (*id.* at p. 438), we do not agree *Katsura*'s holding is that broad, and even if it were, it would seemingly contravene the California Supreme Court's holding in *Retired Employees* recognizing, albeit in the public employment context, that "a county may be bound by an implied contract under California law if there is no legislative prohibition against such arrangements, such as a statute or ordinance." (*Retired Employees*, *supra*, 52 Cal.4th at p. 1176; see *Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 246 ["Governmental subdivisions may be bound by an implied contract if there is no statutory prohibition against such arrangements."].)

written change order requirement in a public contract where no statute, code, ordinance or charter prohibits it.

Nor is *P&D Consultants* persuasive for its broad holding that "public contracts requiring written change orders cannot be modified orally or through the parties' conduct." (*P&D Consultants*, *supra*, 190 Cal.App.4th at p. 1335.) There, the court did not decide whether the city was precluded by any statute or code from modifying the contract as alleged (through conduct). Instead, without citation to any authority beyond *Katsura*, the court concluded the plain language of the contract limited the city's power to contract to a certain prescribed method. (*Id.* at p. 1341.) Yet, the contract itself is not a source of public contracting law nor is it legal authority limiting the ultimate scope of the city's contracting powers, and we find no support for the proposition that a contract *itself* may limit or proscribe a public entity's ultimate power to contract.

*P&D Consultants* also echoed *Katsura*'s criticism of *Weeshoff*'s application of waiver as against the great weight of authority (*P&D Consultants*, *supra*, 190 Cal.App.4th at p. 1342), but the authority cited by *Katsura* involved or discussed contracts that were void as ultra vires of the public entity's ability to contract in scope or mode as provided by statute, charter, or code. (*Katsura*, *supra*, 155 Cal.App.4th at pp. 108–110, citing *Domar Electric, Inc. v. City of Los Angeles*, *supra*, 9 Cal.4th at p. 171, *Los Angeles Dredging*, *supra*, 210 Cal. at p. 353, *Amelco*, *supra*, 27 Cal.4th at pp. 234, 242, *G. L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1093–1094 & *Reams*, *supra*, 171 Cal. at pp. 156–157.) In this case, District presents no argument how any oral or implied-in-fact modification of the written change order requirement was precluded by statute or District's governing document of incorporation and thus rendered void as a matter of law.

Beyond that, *P&D Consultants* distinguished *Weeshoff* on a factual basis for which there is no similar distinction here. The public entity's contract with Weeshoff allowed for extra work without a fully agreed-upon written change order that *P&D*

28.

*Consultants* contrasted with the contract before it that unequivocally required any changes to be approved by prior written amendment *executed by both parties*. (*P&D Consultants*, *supra*, 190 Cal.App.4th at pp. 1336, 1342.) Unlike *P&D Consultants*, the written extra work order requirement here is extremely similar to that in *Weeshoff*. In *Weeshoff*, while any change was to be made in writing, if there was a disagreement about *price* for the extra work, the work could be directed without a negotiated price and paid for based on an extra work payment schedule within the contract that provided compensation for labor, material, equipment and other services. (*Weeshoff*, *supra*, 88 Cal.App.3d at p. 588, fns. 3 & 4.) Similarly here, though no extra work was to be paid unless ordered in writing, if the price could not be fixed "before order for the extra work" was issued, section C-10 provides that the contractor was to be paid based on the same type of extra work payment schedule as in *Weeshoff*. Moreover, any amendment to the contract in *P&D Consultants* had to be executed by the city, but here and in *Weeshoff*, the engineer had express contractual authority to issue change/extra work orders without the written approval of the public entity.

District argues *P&D Consultants*'s holding is consistent with generally recognized principles that the purpose of a written change order is to protect the public entity and taxpayer money from uncertainty that arises when contractors perform unauthorized work without a set budget or established price, and it avoids the painstaking process of finger pointing over payment for additional work months and years after performance and completion of the project.

Written change order requirements in public contracts certainly serve these important ends, but District has pointed to no legal obligation that written change order requirements be included in public contracts; as a matter of adopted public policy or that applying theories of modification, waiver or estoppel would implicate the kind of significant public policy concerns discussed in *Amelco* with respect to abandonment. (See *Amelco*, *supra*, 27 Cal.4th at pp. 239–241.) As we have already observed, many

29.

public entities will not be permitted by their charter or by statute or code to engage in oral modifications or impliedly waive written change order requirements, nor will estoppel apply as *Katsura* illustrates. Contractors who undertake extra work without a written change order in such cases will do so at their peril because they are charged with knowledge of contracting law that binds the public entity. (See *Miller*, *supra*, 20 Cal.2d at p. 89.)

Moreover, written change order requirements are not rendered meaningless simply because they may be susceptible to oral modification or waiver in rare instances. As *Weeshoff* pointed out, written change order requirements are generally upheld. (*Weeshoff*, *supra*, 88 Cal.App.3d at p. 589.) Thus, even though oral modification, implied-in-fact contracts, or doctrines of waiver and estoppel *may* be invoked where not in violation of the public entity's contracting authority or adopted public policy, it does not mean the written change order requirement is unenforceable or can be waived by any purported agent of a public entity. *Weeshoff* explained waiver applied in that case because the district itself had engaged in conduct that constituted the issuance of a change order and waiver of the written change order requirement. (*Id.* at p. 590, fn. 5.) Although a site inspector had purportedly told Weeshoff to use temporary pavement, the site inspector had no contractual authority to issue any change to the contract even by written order. (*Ibid.*)

For this reason, although *P&D Consultants*'s broad holding that public contracts requiring written change orders cannot ever be modified orally or through the parties' conduct is not persuasive, there is little reason to doubt the ultimate outcome there was correct. In that case, the city's project manager had purportedly told P&D to proceed with extra work before the execution of written amendments later signed by the city. Yet, there is nothing in the facts suggesting the project manager had the authority, through the contract or otherwise, to approve an amendment on behalf of the city; the contract required the *written* approval of the city. (See *J. M. Griffith Co. v. City of Los*

30.

*Angeles* (1898) 6 Cal.Unrep. 119, 123 (*per curiam*) [engineer's oral direction to contractor to perform extra work could not bind the city under the contract terms (which required approval by the city for changes), or the city's charter]; *Bares v. City of Portola* (1954) 124 Cal.App.2d 813, 820 [engineer's oral direction to contractor to perform extra work not binding on the city because the contract required a written order by the engineer *pursuant to* the authorization of the city]; *Contra Costa Const. Co. v. Daly City* (1920) 48 Cal.App. 622, 624–625 [the city engineer's oral directions to contractor to perform extra work not binding on the city because contractually extra work would not be paid for unless authorized by resolution of the city's board of trustees and the city charter did not authorize engineers to contract on behalf of the city].)  This distinguishes *P&D Consultants* from the contracts here and in *Weeshoff* where contractual authority to issue change/extra work orders was vested with the engineer and not expressly contingent on agreement by the public entity.[6]

In sum, without any showing District's contracting authority was legally limited in scope or mode such that it was precluded from orally modifying the contract or waiving any written change requirement, *Katsura* simply does not apply.  Further, *P&D Consultants* does not provide a persuasive basis to extend *Katsura* into a bright-line rule that no written change order requirement in a public contract could ever, as a matter of law, be modified by conduct or oral agreement.  Moreover, *P&D Consultants* did not preserve for appeal any argument related to waiver or estoppel, and *P&D Consultants* expressly refused to decide the applicability of those doctrines.  (*P&D Consultants*, *supra*, 190 Cal.App.at p. 1344.)  Within the narrow circumstances of this case, PBC was not precluded as a matter of law from presenting evidence the written change order

---

[6]     District points out a petition for review of the decision in *P&D Consultants* was filed, but the California Supreme Court denied it, which District argues reflected a conscious decision by our high court to allow *P&D Consultants* to remain in force and effect with regard to future circumstances like those in this case.  Nevertheless, we are not persuaded the rule formulated in *P&D Consultants* as an extension of *Katsura* is as broad as *P&D Consultants* held.

31.

requirement had been modified orally or by conduct of the engineer or District, or that waiver or estoppel could be applied.

Finally, because all evidence pertaining to oral modification, waiver, or estoppel was precluded as to alleged extra work, it cannot be determined the exclusion was harmless. The testimony is incomplete as to the circumstances under which extra work was purportedly requested, and there is no testimony or findings whether any of the purported extra work was actually outside the scope of the contract. Notably, there is evidence that at least some of the extra work claimed by PBC was performed knowing the engineer had deemed the work *within* the scope of the contract—e.g., the dispute over imported soil for the excavated tree wells.[7]

The parties have not had an opportunity to address these issues or present evidence in this regard, and so it is incumbent upon us to remand for a new trial. In reversing judgment and remanding this matter to the trial court we express no opinion as to whether any purported extra work was actually outside the scope of the contract, whether the written change order requirement was modified or waived by District or its engineer, or whether estoppel is appropriate.

## II.      Remaining Issues

The parties dispute additional issues regarding the permissibility of liquidated damages, whether the lack of notice of withheld amounts of the contract price precluded any withholding by District, and whether prompt payment penalties should have been assessed. Even to the extent they involve questions of law, the contours of these disputes

---

[7]      In the event PBC disputed the engineer's instructions or directions as involving extra costs not included in the contract price, section C-29 of the contract required PBC to file a claim with the engineer for those costs within 15 days of receipt of such instructions by the engineer, or the claim would be deemed waived. There is no evidence PBC ever filed such a claim for work the engineer deemed within the scope of the contract but PBC believed involved extra costs not contemplated by the contract.

may be affected by determinations related to PBC's claims of extra work for which a new trial is required. Thus, we do not reach the remaining disputed issues.

## DISPOSITION

The trial court's judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion. PBC is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278, subd. (a)(1).)


                                                    MEEHAN, J.

WE CONCUR:


PEÑA, Acting P.J.


DeSANTOS, J.